Filed 4/17/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S170957 |
| v. | ) | |
| | ) | |
| RUBEN BECERRADA, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. LA033909 |
| _____ | ) | |

A jury convicted defendant, Ruben Becerrada, of the first degree murder of Maria Arevalo with the special circumstances of killing a witness, murder in the commission of kidnapping, and lying in wait. As to the murder, it found true a weapon enhancement allegation. It also found defendant guilty of rape, forcibly dissuading a witness, and kidnapping. After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict and imposed a judgment of death. This appeal is automatic. We reverse the lying-in-wait special-circumstance finding for insufficient evidence, but otherwise affirm the judgment.

## I. THE FACTS

### A. Guilt Phase

#### 1. Overview

The prosecution's theory of the case was that in August 1999, defendant raped the victim, Maria Arevalo, with whom he had been living. When she

1

pressed charges, he tried to dissuade her from testifying. In March 2000, after she refused to drop the rape charge, she drove to his neighborhood and parked near his home, apparently intending to visit him. Defendant attacked her shortly thereafter. In front of witnesses, he beat her, kicked her, and hit her on the head with a beer bottle. He then forced her into her own car and drove her to another location. There, he strangled her both manually and with a ligature and stabbed her multiple times, killing her. Finally, he put her body in the trunk of her car, which he abandoned at another location.

In its opening statement and closing argument, the defense admitted defendant killed the victim, but it denied that the killing was premeditated and denied he committed the other charged crimes of rape, dissuading a witness, and kidnapping. The defense also denied the truth of the special circumstance allegations of killing a witness, murder in the commission of kidnapping, and lying in wait.

### 2. The Evidence

Maria Arevalo married Juan Arevalo in 1996, when she was 19 years old. They separated about one and a half years later but remained friends. She worked at a Sav-On drug store in Arleta and later at a Manpower employment agency in Sherman Oaks. After she and Juan separated, she began a troubled relationship with defendant, who was about 34 years old.

During the months leading to August 1999, Juan and others often observed bruises on Maria's arms, legs, and neck. She told Juan that defendant abused her. Juan urged her to end the relationship, but she was afraid to do so. Juan decided to speak with defendant. In a conversation Juan described as "civil," conducted at defendant's home on Dorrington Avenue in Arleta in the San Fernando Valley,

2

defendant denied causing any bruising and said Maria was lying. Defendant also told Juan he was a gang member and showed him his gang tattoos.

Later, Maria told Juan that she had moved in with defendant. She continued to tell him that defendant abused her. She also said defendant had threatened her. She told him "she was afraid about her, her family, and" Juan himself. She did not leave defendant because she was "afraid for her family." She also expressed the hope that defendant might change.

Around 6:00 or 6:30 a.m., on August 8, 1999, Maria called Juan on the telephone. She sounded scared and was "almost crying." He met with her soon after that. Juan observed bruises on her neck, legs, and wrist. She looked scared and was shaking and crying. She told Juan that defendant had raped her. She said what brought it on was that "she wanted to leave." She said defendant choked her to the point that she was "fading out," meaning "losing consciousness." At that point, "she just stopped fighting." Defendant tied her up on the bed and forced her to have sex against her will. She later managed to get away. Before she left, defendant told her not to tell anyone what had happened. He said he knew where her family lived and threatened to kill her parents.

Gerilind Taylor, Maria's supervisor at Manpower, testified that on one occasion in August 1999, she was so concerned about Maria's bruises that she reported them to her corporate office. She saw dark bruising and fingerprints on Maria's neck. When she asked Maria about it, "[a]t first she was very apprehensive, and then she just broke down." "She said she was scared, and she started crying." Maria told her that because she had refused to do a "threesome" with defendant and another girl, defendant raped her and tied her up for several hours. She got the bruising on her neck when defendant pulled her up by the neck. Maria said that defendant told her, " 'I could easily kill you.' " She was afraid that defendant might kill her sometime in the next seven or eight months.

3

Chris Eck, Maria's coworker at Manpower, testified that he met defendant, introduced as Maria's boyfriend, one time at the office. In Maria's presence, defendant began talking to him about his criminal past. Defendant told Eck "that he had been incarcerated as a juvenile for homicide and later as an adult for a double attempted homicide." He said "he was a hit man for the Mexican Mafia," and that "he had killed people in the past, he'd gotten away with it." Later, on a Monday in early August 1999, Maria failed to appear at work, which was unusual. The next day, when Eck asked her about her nonappearance, she told him that defendant "had taken her and tied her up and had repeatedly raped her. She managed to escape, and she was beaten up." She was afraid of defendant. Eck observed "fingerprints around her neck, the bruising from it." When Eck advised her to report it to the police, she said she was afraid to do so "because Ruben would come after her."

Juan also advised Maria to report the rape to the police and took her to the local police department. She did not actually go inside the first time. She was crying and said she was afraid of what defendant might do if she reported it, so Juan took her back home. The next day, Juan called defendant on the telephone and told him he would take Maria to the police station to report the rape. Defendant told him "that I had a family and I should be careful." He added that he knew where Juan and his family lived and what kind of car he drove. Juan considered it a threat. Defendant also called Maria a liar.

On August 11, 1999, Juan and members of Maria's family took her back to the police station. This time, she reported the rape. The police photographed her bruises and gave her a restraining order against defendant. On August 16, 1999, the Los Angeles County District Attorney's Office filed charges against defendant of rape and dissuading a witness. A warrant for his arrest was issued, but he was

never arrested on the warrant. As the alleged victim, Maria was to be the main witness against defendant.

The morning after Maria reported the rape, when Juan left to take Maria to her job at Manpower, defendant was standing at the front door. Maria started screaming to defendant to "get out of there" and showed him the restraining order. Juan said he was going to call the police and grabbed his telephone, at which point defendant left. Within a day or so of this event, two men, apparent gang members, came to the back gate of the house. They told Juan to drop the charges. Concerned about these threats, Juan and Maria moved to another home. Maria also quit her job and began working at Washington Mutual Bank in Northridge. She moved to her mother's house in October 1999. During this time, Maria told Juan about other threats defendant had made to her. She said defendant "knew how to find out things" and showed that he knew where she was living. He told her "he had shot somebody before and got away with it." He also told her that if he were taken into custody, "he wouldn't go alone," which she understood as a threat to her family and Juan. She did not want to tell the police where defendant was living because she was afraid for her family.

Gerilind Taylor testified that after Maria reported the rape, she told her that defendant had threatened her. He also told her that he would give a "sex video" to her parents. She said that she was afraid because defendant was so angry, but she also loved him and thought she could change him.

Chris Eck testified that Maria continued to work at Manpower for a couple of weeks after she reported the rape. During this time, Maria said defendant told her "something along the line if I'm going down for this, then I'm going to take you with [*sic*]. This was a third strike." Partly because of his criminal past, Maria was afraid that defendant would kill her. Defendant had also threatened to send a sex video to her family if she did not withdraw the rape charge. She was also

5

afraid that defendant would retaliate against Juan. Sometimes, however, she would make excuses for the bruises and said she wanted to help defendant.

A coworker at Washington Mutual Bank, where Maria began to work after reporting the rape, testified that Maria was "always scared" of her previous boyfriend. The coworker observed bruises on Maria "all the time." Another coworker at the bank testified that in December and January, 1999-2000, she observed bruising on Maria that Maria said defendant had caused. Maria said that defendant had raped her and she had reported it. She said defendant had told her to drop the case "or he would kill her." He had also threatened her family. Maria did not tell the police where defendant lived because she was afraid of him. At one point, Maria told the coworker that defendant had sent a sex video to her family to intimidate her and try to get her to drop the charges.

A friend of Maria's who often worked out with her at a local gym testified that Maria told her defendant had raped her and later threatened to kill her and to hurt her family if she did not withdraw the rape charge.

Maria Eugenia Herrera, Maria's sister, accompanied Maria when she reported the rape to the police. Maria told her about the rape and defendant's threats, and she observed Maria's bruises. Maria told her that defendant put his hands on her neck and lifted her until she fainted. She also said defendant told her "that he knew how the system worked, and that he could make believe that he was crazy and that way get away with it." Sometime after Maria reported the rape, Herrera received a video in the mail sent to her address. The video was given to the police. It had a return address of "Guess Who" and showed defendant and Maria having sex.

Isabel Mejia, Maria's mother, and Laura Patricia "Patti" Arreguin, her cousin, testified that in March 2000, Maria was living with her family in Arleta. Maria and Patti shared a bedroom. Maria told Patti that defendant had raped and

6

choked her. Maria was working at Washington Mutual Bank at the time. On the days she worked, she would leave home at 4:40 a.m. On those days, the telephone regularly rang before Maria left. Maria told Patti the caller was defendant. Isabel told Maria to tell defendant not to call anymore, but the calling continued. Maria told Patti that the detective investigating the rape case often asked her where defendant was living. Although she knew, she did not tell the detective because she feared defendant. In fact, after her meetings with the detective, she would call defendant to assure him that she had not told the detective where he lived. She would say this to defendant "to try to keep him at bay or pacified."

Naomi Hernandez, who knew defendant well, testified that at some point, defendant told her that Maria had filed a rape charge. He asked her, " 'How can she claim rape when we're living together?' " He said he expected to be arrested on the rape charge and threatened to kill Maria if he was. He said, " 'I'm going to kill' or 'get that bitch, because I'm not going back to jail.' " "He kept on referring to a rape." He also told her that Maria had promised to drop the charge, and he believed she would meet with the district attorney to do so.

On March 3, 2000, Maria met with the deputy district attorney assigned to her rape case. During the meeting, Maria's telephone or beeper went off. Maria looked at it, made a comment, and became afraid. After the meeting, the case remained open and was awaiting defendant's arrest.

The next day, March 4, Maria was scheduled to work at the bank beginning at 4:55 a.m. She never arrived. Her sister testified that the telephone at their home rang as usual that morning around 4:00 a.m. Then she heard Maria leave the house as usual. Witnesses and business records established that around 4:45 a.m. that morning, Maria entered the Sav-On drug store in Arleta, where she used to work, and purchased a pack of Marlboro cigarettes, the brand that defendant

7

smoked regularly.  Maria did not smoke.  The two store employees who saw her testified that she seemed to be in a hurry and was in the store only a short time.

Vanessa F., 11 years old at the time of these events, was among those living with defendant at the Dorrington Avenue residence in Arleta.  Early in the morning of March 4, 2000, while she was still in bed, she heard knocking on her bedroom window.  It was defendant.  She went to the kitchen to open the back door.  She saw defendant alone outside wearing a gray beanie.  She did not know what time it was, but it was light outside.

The Gonzalez family, including teenage sisters M. and L. and their mother, lived just down Dorrington Avenue from defendant.  Around 4:45, on March 4, 2000, the sounds of a woman screaming woke them up.  The screaming commenced by an alley in the back, then moved along the side of their house to the front.  The three women went out the front door and observed a man hitting and kicking a woman, who was in the backseat of a car parked in front.  The woman was screaming for help.  Somehow the woman got out of the car and looked at the Gonzalez family.  Defendant continued to beat and kick her, appearing not to notice the family.  He also hit her on the back or head repeatedly with a bottle like a Corona beer bottle.  The family called for the woman to come to them, but she seemed to freeze.  Suddenly, the woman stopped resisting.  The man grabbed her, put her in the backseat of the car, and drove away.

M. Gonzalez called 911, and the police arrived quickly, but not before the man had sped away with the woman in the back.

Later that morning, police, responding to a report of an abandoned vehicle, found a bluish gray Nissan Altima in the parking lot of an apartment complex on Van Nuys Boulevard, where defendant used to live.  Juan had purchased the car for Maria.  Maria's body, with a ligature around the neck, was in the trunk.  Her clothing was saturated with blood.  The car contained blood both outside and

inside, especially in the rear passenger area. The outside blood was smeared, as if it had been wiped with a cloth.

A witness testified that sometime earlier that morning, she saw a man wiping the car with a rag. The man wore a beanie like one later found in defendant's bedroom.

The autopsy revealed that Maria died of three separate injuries: "The main injury is strangulation at the throat caused by a hard ligature, . . . like a shoe string . . . tightly wrapped around the throat. The second injury is a stab wound into the jugular vein on the left side of the neck and throat, most probably wounding the vein beneath the ligature cord that was wrapped tightly around the neck. And the third injury which is a potentially lethal injury is a blunt-force traumatic injury to the left side back of the head which caused bleeding under the scalp and also small amount of bleeding on top of her brain." In addition to the ligature, there was evidence of manual strangulation.

The ligature was wrapped tightly three times around Maria's neck and tied with a bow or slip knot. Maria's fingernails had been painted with a red acrylic paint. Her right hand was missing three fingernails. Her neck contained abrasions that were probably caused by the victim's fingernails trying to pull the ligature away. A broken piece of a knife remained in her neck beneath the ligature. According to the pathologist, it appeared that "the knife was stabbed into the neck while the ligature was wrapped tightly around the neck and throat. It went downward from top to bottom and beneath the ligature into the vein, through the vein and hit the hard bone of the neck." Her body contained other sharp-force wounds, including defensive wounds on the hands. In the pathologist's opinion, the victim was still alive at the time of the strangulation and the knife wound to the neck.

The blunt-force head wound was consistent with being hit by a bottle and could have caused unconsciousness or severe stunning. The pathologist testified that the likely order of the main injuries were, first, the blunt injury to the head, then the ligature, then the knife wound into the jugular vein. "[T]he most immediately lethal wound is the strangulation."

Because of the absence of evidence of a struggle at the Van Nuys Boulevard apartment complex where the car was abandoned, it appeared Maria was not killed there but at an unknown location. Her body was then placed in the trunk and driven to the Van Nuys location. The trunk contained very little blood.

In the area where the Gonzalez family observed the assault, police found fingernails painted with red acrylic paint that forensic testing established were consistent in all respects with the fingernails that remained on Maria's body. In the same area, police also found Corona beer bottles, one broken.

Defendant was arrested the evening after Maria's body was found, but initially only on the rape charge. He had fresh scratches and other injuries, some of which could have been inflicted by Maria's fingernails. Even though no one mentioned the murder to him, he told the police that he did not kill anyone. He asked one police officer "why he was arrested for 187," an apparent reference to section 187 of California's Penal Code, which defines murder. He told the same officer something like "he didn't want to be a part of his ex-girlfriend's craziness and her having problems with her ex-husband, who he wouldn't be surprised if he went off and killed her." Witnesses testified that after his arrest, defendant faked having seizures, for which he was taken to the hospital.

At the time of his arrest, defendant was living with his mother and several others, including Rosa Marquez, on Dorrington Avenue in Arleta. Police searched his bedroom pursuant to a search warrant. They found a gray knit watch cap or beanie, and a blood smeared pack of Marlboro cigarettes identical to those Maria

10

had purchased the morning of her death. They also found an address book that had belonged to Maria. It contained Maria's handwriting but also various notations, some gang related, in a different handwriting. The different handwriting included matters pertaining to Maria, such as her mother's name, and her family's address and telephone number. Police also found an envelope addressed to defendant's brother containing a photograph of Maria and defendant. On the back was written, "This is the bitch, Ruben, JKS." JKS stands for the Jokers, a clique of the Venice 13 street gang. Defendant bore tattoos consistent with his membership in the Jokers.

Deoxyribonucleic acid (DNA) analysis revealed that the blood on the pack of Marlboro cigarettes found in defendant's bedroom, the blood found on the street on Dorrington, and the blood from Maria's car could not have come from defendant but was consistent with Maria's blood. One analyst testified that the profile of the samples she tested would occur in about one person in 330 billion among unrelated individuals in the Hispanic population and even less often in other population groups.

The distance from Maria's home to the Sav-On drug store was a little over two miles. The distance from there to the two Dorrington Avenue addresses was a little under one mile. The distance from the Dorrington Avenue addresses to the apartment complex on Van Nuys Boulevard where the car was abandoned was about one mile.

At the preliminary hearing in August 2004, an investigating officer escorted Rosa Marquez to the courtroom where she was to testify. While doing so, he observed defendant make a hand sign to Rosa that signified the Venice 13 street gang.

Sandra Baca testified as an expert on "intimate partner violence," which used to be called "battered women's syndrome," to help explain Maria's behavior.

11

Defense counsel cross-examined prosecution witnesses, but defendant presented no witnesses of his own.

## B. Penalty Phase

### 1. Prosecution Evidence

A friend of Maria's, her parents, her brother, a sister, a cousin, and two uncles testified about Maria and the impact her death had on them and her family.

The prosecution presented evidence of defendant's prior criminal behavior involving force or violence.

In August 1980, when defendant was 16 years old and a member of the Venice 13 gang, he was involved in the gang-related murder of a rival gang member. The victim was fatally shot in the head, apparently while riding a bicycle. Defendant was not the actual shooter and apparently was not present at the shooting. He was present at a meeting in which the shooting was planned, and he provided a screwdriver to help another gang member steal a car to use in the shooting.

In the 1980's defendant physically abused his then girlfriend.

In March 1984, defendant shot two persons, for which he was convicted of one count of assault with a deadly weapon.

Defendant also had two prior burglary convictions, one conviction of petty theft with a prior theft-related conviction, and one conviction of possession of cocaine.

The prosecution also presented evidence of many instances of defendant's criminal behavior in the county jail between 2001 and 2004, after his arrest in this case, which involved force or violence or the threat of force or violence. On numerous occasions, defendant possessed razor blades or shanks that could be used as weapons; he assaulted fellow inmates and jail staff, sometimes inflicting

12

serious injuries; and he possessed urine and feces, which he often used to "gas" jail staff, that is, to spray them with the urine and feces. In addition to actual incidents of gassing, defendant often threatened to gas or otherwise assault staff.

### 2. *Defense Evidence*

Defendant's mother, sister, stepfather, and uncle testified about his unhappy and difficult childhood. His mother was Hispanic and his natural father "Afro-Cuban." Because of the interracial aspect, when they married, the mother's family "didn't like it at all." His father abused him and his mother. Eventually, the marriage ended, and defendant's father left, leaving the family with no money. After that, defendant's mother often beat him with a belt or shoe. Defendant's uncle sometimes took care of him, even though he was a heroin addict and often injected heroin in front of defendant. The uncle testified that partly because of this, defendant became a heroin addict himself. When defendant was 13 or 14 years old, the uncle had him help in a robbery to get money to support the uncle's heroin addiction.

Defendant's mother remarried, but the stepfather also was involved in criminal conduct. At one point, both defendant's uncle and his stepfather were in the same prison, and defendant sometimes visited them there. The stepfather introduced defendant to other inmates, including members of the Mexican Mafia. Defendant was also affected by racial tension in his neighborhood. As a result of these and other factors, he became involved in gang activity and criminal conduct at a young age.

Two Los Angeles County deputy sheriffs testified that during the approximately two-year period before the trial, beginning around January 2007, defendant had behaved well in jail and often volunteered for work assignments.

13

Dr. Roger Light, a neuropsychologist, testified about defendant's mental condition. In his opinion, defendant "reflect[ed] deficits in several aspects of both neuropsychological functioning and cognitive intellectual functioning."

### 3. *Rebuttal and Surrebuttal*

Dr. Robert Brook, a clinical psychologist specializing in neuropsychology, testified for the prosecution on rebuttal about defendant's mental condition. He disagreed with some of Dr. Light's opinions. Dr. Light then testified on surrebuttal, reiterating his opinion.

## II. DISCUSSION

### A. Guilt Issues

### 1. *Admission of Photographs of Defendant's Tattoos*

Before the opening statements, defendant objected to the prosecution's showing the jury pictures of his gang tattoos on the basis that they were more prejudicial than probative. The photographs also showed the scratches on defendant's body when he was arrested. Defense counsel argued "they're full body depictions of the tattoos. That issue is not going to be at issue. We're going to be agreeing that he has gang tattoos on his body." She argued the "full panorama of tattoos is [not] necessary to depict" the scratches.

The court overruled the objection: "You can't, by saying there is no issue on it, take away the strength of the prosecution's evidence, because they still have to prove it, even if you're not going to contest it." It found no prejudice. It explained that the pictures "show scratches on his neck and his right shoulder, the back of his right shoulder, but I would think given what I've heard of the evidence in this case, that the tattoos themselves are significant. They tend to be somewhat overpowering to the extent that they do show the gang Venice Jokers on the back and have some interesting perhaps frightening images, which may have to do with

14

the fact that the victim in the case did not, Maria did not report the, or was reluctant to report the violation and/or was more compliant with any demands that were made. But anyway, there is no prejudice involved at all. The objection to the tattoos is overruled. It's much better to show the tattoos than have him display these during the trial anyway."

During the trial, the photographs were used to show the scratches on defendant's body and as evidence of his membership in the Jokers clique of the Venice 13 gang. The investigating officer testified that one tattoo was "the largest one I've ever seen with a [Venice 13] gang member."

At the end of the prosecution's case-in-chief, defendant renewed his objection to the pictures of his tattoos. The court overruled the objection. It noted that the photographs "obviously show the wounds that [defendant] did sustain at some point, and the question is how they got there. But it was well stated that you're talking about the intimidation and those tattoos, and to some extent the caricatures are significant as well. I couldn't see all of them, but there's a tattoo of a woman on his lower back, in the center lower back that is suggestive of his attitude about women, which is consistent with our — this recent witness." This latter statement clearly refers to the final prosecution witness, the expert who testified about intimate partner violence.

Defendant contends the court erred in admitting the photographs. He argues they were more prejudicial than probative under Evidence Code section 352. We disagree. The court acted within its discretion in concluding that the evidence was more probative than prejudicial. (*People v. Jones* (2011) 51 Cal.4th 346, 373.) "[E]vidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's

15

territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Defendant's gang membership permeated the entire case. It was defendant, not the prosecution, who first interjected it into the case. He flaunted his gang membership and criminal past as a major part of his campaign of intimidation and his efforts to dissuade Maria from testifying against him. When Juan Arevalo confronted defendant about Maria's bruises and her statements that defendant was abusing her, defendant said she was lying. He also told Juan he was a gang member and showed him the gang tattoos depicted in the photographs. During this same time period, defendant also told Maria's coworker, Chris Eck, about his criminal past and gang connections. Additionally, the jury could reasonably infer from the evidence that shortly after Maria reported the rape, defendant sent two of his fellow gang members to try to intimidate Juan and, through him, Maria. The address book found in his bedroom contained gang notations. On the picture of Maria in the envelope addressed to defendant's brother was written, "This is the bitch, Ruben, JKS."

As the trial court noted in overruling the objection, the fact defendant said he would agree there were gang tattoos on his body did not make the evidence irrelevant or unduly prejudicial. Defendant pleaded not guilty, which forced the prosecution to prove its case. It was entitled to do so. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 407.) Additionally, given the evidence and defendant's statement that he agreed he had the tattoos, it was inevitable the jury would learn of his gang membership. Under the circumstances, the court had good reason to find the photographs would be probative and not unduly prejudicial. It acted within its discretion in admitting them.

One of the tattoos, which defendant describes as depicting "a woman in a sexually submissive pose," was not itself clearly gang related. The trial court specifically referred to it and overruled defendant's objection under Evidence Code section 352. We see no abuse of discretion in this ruling either.

### 2. *Admission of Evidence that Defendant Made a Gang Hand Sign*

The investigating officer testified that when he brought Rosa Marquez into the courtroom to testify, he observed defendant make a hand sign to her that signified the Venice 13 street gang. Defendant objected to the testimony "as more prejudicial than probative." The court sustained the objection "on foundation." After the prosecutor asked further questions to lay a foundation, defendant again objected and asked for a ruling on the testimony's relevance and probative value. The court stated that lack of foundation was the only ground on which it had sustained the objection, and it otherwise overruled the objection. When defendant asked the court to note his continuing objection to the "prejudicial information," the court responded, "You asked for the foundation, you're getting the foundation. If you don't like it, don't ask for it. Overruled." The witness then testified about the hand sign and why he, an expert regarding gangs, believed it signified the Venice 13 street gang.

During a break in the testimony, and outside the jury's presence, the court acknowledged it had not understood that defendant's objection was based on the ground that the evidence was more prejudicial than probative. It again overruled that objection. It continued to find no prejudice from the evidence: "You still haven't identified any prejudice. I don't see any prejudice in it. Normally the prejudice of gang membership is great in the abstract. . . . We don't bring it in when it's unnecessary, but in this case it's going to be — it's contained throughout, not only on the outsized letters on the defendant's back, but when he,

17

for instance, wrote his brother and has — and signs it with his name and then JKS, he's still indicating gang activity, and it comes in in front of the jury, that's very significant as to his attitude about the victim in the case. I see no prejudice at all."

We see no abuse of discretion for essentially the same reasons the court did not abuse its discretion in admitting the photographs showing defendant's tattoos. Defendant's gang affiliation permeated the case. The prosecution did not present extensive evidence regarding the Venice 13 gang's criminal activities. But the limited evidence the court permitted was permissible.

### 3. Admission of Gang Notations in an Address Book

An address book that the evidence showed had belonged to the victim was found in defendant's bedroom after he killed her. It contained the victim's writing but also writing in what appeared to be a different hand, which contained gang notations and information concerning the victim. When the investigating officer began to testify about the notations, defendant objected on hearsay grounds. The court overruled the objection. After the officer further testified about gang nicknames, or monikers, contained in the book, defendant also objected under Evidence Code section 352 that the testimony was more prejudicial than probative. The court overruled the objection but added, "I'm not sure where we're going with this. I'm concerned about relevance." The prosecutor commented, "I was just pointing out various things, given some of the evidence in this case." From that point on, the prosecutor asked no further questions regarding gang notations or monikers.

Defendant contends the court erred on two grounds. First, he argues the testimony was inadmissible hearsay. The Attorney General argues the testimony was offered for a nonhearsay purpose. Defendant disagrees. We need not decide the point, for the court had discretion to overrule the hearsay objection even if the

18

testimony was offered for the truth of the matter asserted. The obvious exception to the hearsay rule that applies here is the one for statements of a party. (Evid. Code, § 1220.) The testimony regarding the address book was based on the belief that defendant wrote the notations. If so, no hearsay problem exists, for defendant was a party, and the testimony was offered against him. (*People v. Horning* (2004) 34 Cal.4th 871, 898.) Defendant argues the prosecution presented no foundational evidence, such as handwriting comparison testimony, establishing that he did, indeed, make the notations. However, under the circumstances, the court and, ultimately, the jury could readily find that defendant did write the notations. The victim and defendant had been living together, the address book was found in defendant's bedroom, the notations were consistent with other things defendant had said and written (such as the letter to his brother, also found in the bedroom), and the notations contained information about the victim. Indeed, it is hard to imagine who, other than defendant, might have made the notations. The trial court acted within its discretion in overruling the hearsay objection.

Defendant also argues the testimony about the gang notations was more prejudicial than probative. But, again, the court had discretion to conclude otherwise and to permit the bit of testimony that had already occurred while expressing concern about possible further testimony. This testimony also showed that defendant's gang membership was important to him, that he flaunted it, and that it played a significant role in his campaign of intimidation.

### 4. Admission of a Statement by Defendant

Chris Eck, the victim's coworker at Manpower, testified that one time, before the rape, he met defendant at the office. In Maria's presence, defendant said "that he had been incarcerated as a juvenile for homicide and later as an adult

19

for a double attempted homicide," that "he was a hit man for the Mexican Mafia," and that "he had killed people in the past, he'd gotten away with it."

After the opening statements to the jury, but before the guilt phase testimony, defendant objected to this testimony on relevance grounds. The court found the testimony "clearly relevant to the issue that you [defense counsel] had addressed in your opening statement as to whether there was a rape or not, if it was a figment of her imagination or just false statement, but the answer to that is if there was a real rape and she's terrified of a possible Mexican Mafia hit man, she's going to keep her mouth shut and figure, well, it was bad enough, I'm not going to make it worse. It's clearly relevant. The only issue would be whether it's so prejudicial, whether there is some — one of the problems would be that it's being a braggart, he's making up stories to terrify people, but it still has the effect of terrifying the victim, so whether it's true or not, it's admissible."

The prosecutor indicated that there was some factual support for the statement, which would be presented at the penalty phase. The court invited defendant to renew the objection "if you get something new that you want to . . . be heard about on that issue," but otherwise, "based on what's been offered here," it found the evidence relevant. Defense counsel agreed that there was factual support for "some" of the statement, but added that he was not aware of any evidence that would support "the idea that he was a Mexican Mafia hit man," and that that part of the statement was "braggadocio." The court responded, "That could be. And, in fact, that's a fair part of an argument, but it still has the effect of even more so of terrifying the victim in the case." The court offered to give a special limiting instruction if defendant wanted one. Defendant did not request a limiting instruction, and the court did not give one.

Defendant contends the court erred in admitting the testimony. However, the court had discretion to admit the evidence for the reasons it stated. Whether or

20

not the statements were true, that defendant made them in the victim's hearing was another relevant piece of evidence showing that he was intimidating and, as the court put it, "terrifying" her. This was relevant both to help explain the victim's apparent reluctance to report the rape and to whether the rape actually occurred. As defendant notes, Eck testified on cross-examination that, because he considered the conversation to be "casual," he, Eck, did not think defendant was trying to intimidate him. But this cross-examination did not establish that the court abused its discretion in its earlier ruling, which was based on the offer of proof. Defendant did not renew his objection. In any event, it was not the impact of the statement on the witness that mattered, but the impact on the victim. The victim was not able to testify herself as to the statement's impact, but the court could reasonably admit the evidence and permit the jury to judge its significance for itself in light of all of the evidence.

Citing *People v. Albarran* (2007) 149 Cal.App.4th 214, where the Court of Appeal found reversible error in admitting substantial gang evidence, defendant argues the court should have excluded the evidence as too prejudicial under Evidence Code section 352. The *Albarran* court found that, although some of the gang evidence admitted in that case was relevant, the trial court also permitted much evidence that "was irrelevant, cumulative and presented a substantial risk of undue prejudice." (*Albarran*, at p. 228.) Here, by contrast, relatively little gang evidence was presented, and the trial court scrutinized all of it. We see no abuse of discretion.

### 5. *Admission of a Statement by the Victim*

Maria's sister testified that when she accompanied Maria to the police station to report the rape, Maria said that defendant had told her "that he knew how the system worked, and that he could make believe that he was crazy and that

21

way get away with it." At that point, defendant asked that the statement "be limited to state of mind." The prosecutor argued that the statement was admissible as a spontaneous statement under Evidence Code section 1240. The court questioned whether it should be limited to state of mind. Defendant agreed the statement could be viewed as a threat and, as such, was admissible to show Maria's state of mind. But he argued that "with respect to anything else, I believe it's simply double hearsay and unreliable." Ultimately, the court agreed with the prosecutor that the statement was a spontaneous statement and overruled the objection.

Defendant contends the court erred in not limiting the statement to Maria's state of mind. He argues the statement does not come within the exception to the hearsay rule for spontaneous statements. Evidence Code section 1240 makes a statement that describes something the declarant perceived an exception to the hearsay rule if that statement "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." To qualify for this exception, (1) there must have been a startling occurrence that produced nervous excitement, thus making the statement spontaneous and unreflecting; (2) the statement must have been made before there was time to contrive and misrepresent; and (3) the statement must relate to the occurrence preceding it. (*People v. Merriman* (2014) 60 Cal.4th 1, 64.)

We need not decide whether the court properly admitted the statement as a spontaneous statement, for any error was harmless. As defendant recognized at trial, the statement was at least admissible for the limited purpose of showing the victim's state of mind. Evidence Code section 1250, subdivision (a) permits "evidence of a statement of the declarant's then existing state of mind [or] emotion," when "(1) The evidence is offered to prove the declarant's state of mind [or] emotion . . . when it is itself an issue in the action; or [¶] (2) The

22

evidence is offered to prove or explain acts or conduct of the declarant." The statement was admissible to show Maria's state of mind, that is, that she perceived defendant's statement as a threat and was therefore afraid of him. Maria's fear of defendant, and her conduct in light of that fear, was at issue in the action.

Any error in allowing the jury to consider the statement for its truth — to show that defendant actually said he knew how the system worked and could "get away with it" by pretending to be crazy — was harmless. The evidence was presented very briefly and never exploited. The prosecutor did not mention the statement in her arguments to the jury. Defendant contends the evidence was especially prejudicial at the penalty phase. We disagree. This point, never exploited, was minor in light of the case as a whole. We see no reasonable possibility any error contributed to the penalty verdict. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961.)

### 6. *Claims of Instructional Error*

Defendant reiterates two instructional claims we have repeatedly rejected. We see no reason to reconsider our previous rulings. The court did not err in instructing the jury on first degree murder even though the information simply charged murder under Penal Code section 187 without specifying the degree. (*People v. Jones* (2013) 57 Cal.4th 899, 967-969.) A series of standard instructions the court gave — CALJIC Nos. 2.01, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 8.20, 8.83 — did not undermine the reasonable doubt standard. (*People v. Whalen* (2013) 56 Cal.4th 1, 70-71; *People v. Dement* (2011) 53 Cal.4th 1, 53-55.)

### 7. *Validity of the Lying-in-wait Special-circumstance Finding*

Defendant contends the evidence is insufficient to support the lying-in-wait special-circumstance finding. We agree.

To determine whether the evidence supports a special-circumstance finding, we must review " 'the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find' " the special circumstance allegation true " 'beyond a reasonable doubt.' " (*People v. Johnson* (2015) 60 Cal.4th 966, 988.)

"At the time of defendant's crime, the special circumstance required that the murder be committed 'while lying in wait.' ([Pen. Code] § 190.2, former subd. (a)(15) . . . .)" (*People v. Streeter* (2012) 54 Cal.4th 205, 246, fn. omitted.) This "special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Stevens* (2007) 41 Cal.4th 182, 201.)

The prosecution's theory to support the lying-in-wait special circumstance was that when defendant learned that Maria had not dropped the rape charge when she met with the prosecutor on March 3, 2000, he lured her, unsuspecting, to his home the next morning, intending to kill her; then, after watching and waiting for the opportune time to act, he attacked her from a position of advantage and intentionally killed her. If substantial evidence had supported this theory, it would have been sufficient to establish the special circumstance.

The evidence showed that defendant expected Maria to drop the charges and supported a finding that he intended to kill her if she did not do so. It also showed that he called Maria early the morning of March 4, 2000, as he often did, and that, rather than go straight to work, she drove to defendant's neighborhood and parked near his home, stopping at a store on the way to buy a pack of defendant's favorite cigarettes. At some point after she arrived, defendant began

24

to attack her, an attack that culminated in his hitting, stabbing, and strangling her. This evidence supports a finding that defendant intended to kill her if and when he learned that she had not dropped the charges, and that he did kill her when he learned that the charges were still pending.

Missing, however, is any evidence that defendant learned *before* her fatal trip to his home that Maria had not dropped the charges. It appears that Maria was hoping to appease defendant by bringing him a pack of his favorite cigarettes. But no evidence exists whether she did so because she had already told him she was not dropping the charges, or because she intended to tell him when she met him. There was no evidence regarding the content of the telephone conversation between Maria and defendant early that fatal morning or any other evidence supporting a finding that defendant knew she had not dropped the charges before she arrived at his home.

The evidence strongly supports a jury finding that defendant killed Maria premeditatedly when he learned that she had not dropped the charges, but it does not support a finding that he had lured her to his home intending to kill her. Thus, there is no evidence of a substantial period of watching and waiting for an opportune time to act. Accordingly, we conclude the evidence does not support the lying-in-wait special-circumstance finding; therefore, we reverse that finding.

**B. Penalty Issues**

*1. Claims of Evidentiary Error*

Defendant contends that two sheriff's deputies who testified about his misconduct in jail gave impermissible hearsay and opinion testimony.

*a. Factual Background*

Deputy David Florence testified that he had been a deputy sheriff for 21 years, much of that time working in the county jail. During this time, he got to

know defendant very well. He testified about one occasion when five razor blades altered for use as weapons were found in a latex glove secreted in defendant's buttocks.

When asked whether defendant often acted aggressively towards the jail deputies, Deputy Florence responded, "That was commonplace behavior for Mr. Becerrada. It was his way of getting attention or trying to manipulate the situation wherever it was, whether it was, . . . it didn't really matter where it was as long as he was getting the attention and got what he wanted." Defendant objected to the testimony as "an opinion and conclusion," and asked that it be struck from the record. The court sustained the objection. The prosecutor asked, "Did you also observe situations where the defendant would act aggressively or violent[ly] towards deputies in order to get whatever it was that he wanted?" The court again sustained defendant's objection that the question asked for an opinion and conclusion. The prosecutor then asked whether defendant "would ask for things, and when refused, he would act in an aggressive or violent manner?" Deputy Florence responded that yes, such behavior was common for defendant. He also testified that in general "some inmates will attempt to manipulate the system by causing problems within the jail facility to get what they want."

Deputy Florence testified that during his career working in the jail, he had been in contact with "thousands" of inmates. The prosecutor asked "in terms of the defendant and your experiences with him," how he compared with other inmates in terms of difficulty or violence. Defendant objected on the ground the question called for a conclusion or opinion. The court overruled the objection, and the witness responded, "I'd say out of my time dealing with individuals who are either arrested and incarcerated, he probably rates in the top five of people that are able to manipulate any given situation however he wants the outcome to come for him."

26

The prosecutor also asked Deputy Florence, "Would it be a common occurrence within what you personally observed of the defendant that he would challenge deputies within the facility to fight?"  He responded,  "Yes."  The prosecutor asked,  "In other words, if the defendant said to a deputy, take this waist chain off and let's go one on one, was that something that was a common occurrence with the defendant in this case."  Defendant objected on the basis of hearsay, which the court overruled.  The prosecutor added, "That you're aware of."  The witness responded, "Yes.  Mr. Becerrada oftentimes would do different things to get the attention of others and take the attention off of him, and oftentimes it had to do when he was either being moved to and fro, whether it was coming back to court or work pass or whatever."  Defendant objected regarding his "intention, that's an opinion."  He asked that it be struck from the record.  The court sustained the objection.

The prosecutor questioned Deputy Florence about the importance in a jail setting of paying attention "not only to what an inmate might say to you, but also to, like you said, what their conduct is, what their behavior indicates."  He said, "Sure," and added, "It's especially important in working in a high power area.  All of the individuals that are there fall in that category, extremely dangerous."  After the court sustained defendant's objection to another question, the prosecutor asked, "Did the defendant, based on your observations, present a danger to the deputies working within the [jail] module?"  Defendant objected on the basis that the question called for an opinion or conclusion.  The court overruled the objection, and the witness responded, "Yes."  He also testified that defendant also presented a danger to other inmates and custodial staff.

The prosecutor asked Deputy Florence, "Did the defendant ever act in a manner, in your opinion, from what you observed, where he was seen to be afraid of any other inmates?"  Defendant objected that it called for a conclusion, which

27

the court overruled. The witness responded, "No. I believe that his actions oftentimes was to show the other inmates that he wasn't afraid." The prosecutor asked, "And how would an inmate tend to show other inmates that you're not afraid, either of the deputies or of other inmates?" The witness responded, "By their intentional disregard for the rules, disobeying instructions, orders, provoking fights with other inmates, fights with deputies, assaulting deputies, slashing deputies. Whatever it takes to get the attention that they're to be accepted." The prosecutor followed up with this question: "And would those behaviors, the type of conduct that you just described, would that be the type of behavior that would gain the inmate respect from other inmates by being aggressive or violent or disobedient with deputies?" Defendant objected on the basis the question "calls for speculation." The court overruled the objection, and the witness responded, "Yes."

Deputy Mike Davis had worked at the central county jail for about six years. He testified about numerous incidents of defendant's possession of hidden weapons, such as razors, and of gassing jail staff. On cross-examination, defendant elicited Deputy Davis's testimony, based on his experience, that sometimes jail inmates would try to be transferred away from the section of the jail where defendant was housed because they were afraid of other inmates. On redirect examination, the prosecutor asked, "Did the defendant ever seem to you to be an inmate who was afraid for his safety?" Defendant objected on the basis that the question called for a conclusion or opinion. The court overruled the objection, and the witness responded, "I don't think he was afraid for his safety. I think there were some people maybe he wasn't getting along with, and I think he was more than a willing participant to do to them what they did to him, and I think that's why he was bringing the razors in for that reason, too."

28

### b. Analysis

Defendant contends Deputy Florence's testimony that defendant was among the "top five" inmates in manipulating a situation was impermissible opinion testimony. We disagree.

It is not clear from the record whether the evidence was offered and admitted as *expert* opinion — based on the witness's expertise as a correctional officer — or as *lay* opinion. We will assume the evidence was offered as lay opinion. As such, it was admissible. "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid. Code, § 800.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 153; accord, *People v. Seumanu* (2015) 61 Cal.4th 1293, 1310-1311.) Here, the witness knew defendant well and had had contact with "thousands" of inmates. "On this record, we cannot say that [the witness's] testimony lacked a rational basis, or that it failed to clarify his testimony." (*Farnam*, at p. 153.) The testimony certainly came "within the experience of a correctional" officer like Deputy Florence, with several "years of security experience" in a jail setting. (*Ibid*.)

Defendant argues that the opinion "did not relate to any particular incident offered in aggravation and therefore was not necessary for his testimony"; and that "it did not assist the jurors in reaching their ultimate decision under the statutory framework and therefore was an improper opinion." However, " '[v]iolent "criminal activity" presented in aggravation may be shown in context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness.' " (*People v. Welch* (1999) 20 Cal.4th 701, 759, quoting *People v. Melton* (1988) 44 Cal.3d 713, 757.) Deputy Florence's opinion helped the jury to determine how serious defendant's criminal behavior in jail was. (*Welch*, at p. 759.) It "merely placed in context other admissible incidents in aggravation at the

penalty phase. The evidence tended to show the gravity of [the defendant's] violent and threatening criminal conduct behind bars . . . ." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1054.) Accordingly, the "court acted well within its discretion in permitting the lay opinion testimony." (*People v. Farnam, supra*, 28 Cal.4th at pp. 153-154.)

Next, defendant contends Deputy Florence's testimony that it was common for defendant to say to a deputy, "take this waist chain off and let's go one on one," was inadmissible hearsay. In context, however, the testimony was clearly based on what the witness had personally observed rather than on what he had heard from others. The immediately preceding question was whether it was common "*within what you personally observed* of the defendant that he would challenge deputies within the facility to fight." (Italics added.) In his reply brief, defendant argues the testimony was too general to be admissible hearsay even it if was based on the deputy's personal observations. Because he did not object on that basis at trial, he cannot make the argument on appeal. (*People v. Kennedy* (2005) 36 Cal.4th 595, 612.) Moreover, defendant cites, and we are aware of, no authority making that a valid basis on which to exclude the testimony. The court acted within its discretion in admitting the testimony. (*People v. Jones*, *supra*, 57 Cal.4th at p. 956.)

Next, defendant contends that Deputy Florence's testimony that defendant presented a danger in jail was also inadmissible opinion testimony. However, for reasons similar to the reasons we rejected defendant's earlier argument regarding opinion testimony, we find the trial court acted within its discretion in permitting this testimony. It was based on Deputy Florence's own perceptions and helped illuminate the incidents that he testified to. By providing context for the evidence of defendant's specific criminal behavior in jail, it helped the jury understand the testimony.

Next, defendant contends Deputy Florence "improperly speculated that [defendant] committed misconduct in order to gain respect from other inmates." However, this testimony was not mere speculation; it was also based on the witness's perceptions, drawn from his extensive experience with jail inmates in general, and with defendant in particular. Again, we see no abuse of discretion.

Finally, defendant contends Deputy Davis's testimony that he did not believe defendant was afraid for his own safety was also inadmissible opinion testimony. The prosecutor elicited the opinion on redirect examination after defendant had elicited the opinion from the same witness that some inmates tried to transfer into another jail unit out of fear. It was, accordingly, a relevant response to the cross-examination. Moreover, the testimony was also based on the witness's perceptions drawn from years of experience, including much with defendant personally. Again, we see no abuse of discretion.

### 2. *Claim of Instructional Error*

Penal Code section 190.3, factor (b), directs the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Regarding this factor, the court instructed as follows: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts: murder, conspiracy to commit murder, attempted murder, assault, battery, battery by gassing of a custodial or peace officer, attempted battery by gassing of a custodial or peace officer, assault with force likely to cause great bodily injury, possession or manufacture of a weapon while confined in a penal institution or county jail, and obstructing or resisting a peace officer, which involved the express or implied use of force or violence or the threat of force or

31

violence. Before a juror may consider any criminal act as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit the criminal act. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance."

The court also instructed that as to any unadjudicated criminal acts, "the defendant is presumed to be innocent, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he's entitled to be found not guilty." It defined reasonable doubt. (See CALJIC No. 8.87.)

When the court and parties had previously discussed these instructions outside the jury's presence, defense counsel stated that, "after conferring," defendant did not want the court to instruct the jury on the elements of the unadjudicated offenses.

Defendant now contends this instruction "improperly directed [the jurors] to find that certain acts were committed with force and violence and permitted them to consider acts that were not committed with force and violence as aggravating circumstances under [Penal Code section 190.3,] factor (b)." With one possible exception, all of the crimes on which the court instructed inherently involved force or violence or the threat of force or violence. (See *People v. Nakahara* (2003) 30 Cal.4th 705, 719-720 [possession of a weapon in jail constitutes implied threat of violence].) The court left it to the jury to determine whether defendant committed any of those crimes. " . . . CALJIC No. 8.87 is not invalid for failing to submit to the jury the issue whether the defendant's acts involved the use, attempted use, or threat of force or violence. (*People v. Ochoa* (2001) 26 Cal.4th 398, 453.) The question whether the acts occurred is certainly a factual matter for the jury, but the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, would be a legal

matter properly decided by the court." (*People v. Nakahara, supra*, 30 Cal.4th at p. 720.)

Defendant notes, correctly, that some of the acts the various witnesses described in recounting his criminal behavior, considered in isolation, either did not amount to a crime or did not involve force or violence. That is generally the case. Not every action a person takes in committing a crime is, by itself, criminal. But when a continuous course of criminal activity involves force or violence, the jury may consider the entire course of conduct. Penal Code "[s]ection 190.3, factor (b), refers to 'criminal activity,' not specific crimes. . . . [¶] . . . [C]ontinuous criminal activity is not segmented into portions, with those portions not themselves involving violence excised. . . . [A]ll crimes committed during a continuous course of criminal activity which includes force or violence may be considered in aggravation even if some portions thereof, in isolation, may be nonviolent." (*People v. Cooper* (1991) 53 Cal.3d 771, 840-841.) The trial court should not, however, *instruct* the jury regarding any nonviolent crime. (*Id*. at p. 841.) With one possible exception, the court did not do so. Moreover, the court specifically prohibited the jury from considering in aggravation any criminal act not listed.

To the extent defendant argues the court should have instructed the jury on the elements of the crimes it listed, his attorneys specifically stated they did not want such instructions. No sua sponte duty exists to instruct on the elements of crimes presented in aggravation at the penalty phase. (*People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1054.) Good reason exists for not imposing such a duty. "[T]he rule absolving the court of a sua sponte duty to instruct on the elements of crimes introduced under [Penal Code section 190.3,] factor (b), ' "is based in part on a recognition that, as [a] tactical matter, the defendant 'may not want the penalty phase instructions overloaded with a series of lengthy instructions on the

elements of alleged other crimes because he may fear that such instructions could lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die.' [Citations.]" ' " (*People v. Anderson* (2001) 25 Cal.4th 543, 588.) Here, substantial evidence existed that the elements of the various crimes the court listed were satisfied. "Under these circumstances, counsel could reasonably wish to avoid focusing the sentencer's attention on the ample evidence that the elements of those offenses were satisfied." (*Ibid.*)

To the extent defendant argues the court should have listed every specific crime involving force or violence that the evidence supported — for example, every instance of gassing that the witnesses testified about — we find no sua sponte duty to do so, largely for the same reasons no sua sponte duty exists to instruct on the elements of the crimes. A defendant would generally not want the jury reminded of every crime the evidence showed, especially when, as here, the crimes were numerous. Defendant certainly would not have benefited from the court's listing of every single act of gassing or assault in jail that the evidence showed.

Regarding the possible exception we have mentioned, defendant argues that the court's including obstructing or resisting a peace officer in the list of crimes the jury could consider allowed it to consider criminal acts that did not involve force or violence. "Acts or words," he argues, "that delayed an officer, diverted an officer's attention from his or her duties, or otherwise forced an officer to deal with [defendant] rather than focus on other duties would have been enough for the jurors to find that [defendant] obstructed an officer." The meaning of the instruction in this regard is not entirely clear. The instruction told the jury to consider the listed offenses, including "obstructing or resisting a peace officer, which involved the express or implied use of force or violence or the threat of force or violence." This language might be construed as permitting the jury to

34

consider evidence of obstructing or resisting an officer *only* if it involved force or violence. But it might also be construed as telling the jury that all of the listed crimes involved force or violence.

We need not resolve this ambiguity. Even if we assume the jury would interpret the instruction as telling it to consider all crimes of obstructing or resisting a peace officer, whether or not they involved force or violence, the error was harmless beyond a reasonable doubt. The jury received extensive evidence of defendant's very violent criminal conduct in jail. Any nonviolent obstructing or resisting a peace officer was trivial by comparison. Moreover, "the jury properly heard all the evidence" regarding defendant's continuous courses of criminal activity, including any nonviolent crimes he committed during those courses of conduct. (*People v. Cooper*, *supra*, 53 Cal.3d at p. 841.) Instructing on "the nonviolent crimes added little, if anything, to the impact of the evidence and the instructions on the far more serious violent crimes." (*Ibid.*)

Contrary to defendant's argument, the line of cases from the United States Supreme Court commencing with *Apprendi v. New Jersey* (2000) 530 U.S. 466 does not affect these rules. (*People v. Ochoa*, *supra*, 26 Cal.4th at pp. 453-454; *People v. Anderson*, *supra*, 25 Cal.4th at pp. 589-590, fn. 14.) The court did not prejudicially misinstruct the jury regarding Penal Code section 190.3, factor (b).

### 3. Cumulative Prejudice and the Effect of Reversing One Special-circumstance Finding

Defendant contends the cumulative effect of the asserted errors requires reversal. We have reversed the lying-in-wait special-circumstance finding. Defendant argues that reversal also requires reversal of the death judgment. We disagree.

Two valid special-circumstance findings remain: killing a witness and murder in the commission of kidnapping. Moreover, "the jury was statutorily

35

permitted to consider all of the facts and circumstances underlying [Maria's] murder." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1186.) The jury would have viewed that murder almost the same way had it not found true the lying-in-wait special circumstance allegation. (*People v. Sandoval* (2015) 62 Cal.4th 394, 423.) "Even if the jury had concluded there was insufficient evidence of watching and waiting to find the lying-in-wait special circumstance true, that conclusion would have done little to alter the highly aggravated nature of [defendant's] murder of [Maria] . . . . Nor would it have changed the jury's assessment of the other aggravating evidence introduced. We conclude there is no reasonable possibility that the error affected the penalty phase verdict." (*Ibid*.)

Defendant argues that, in this case, the invalid special-circumstance finding did significantly alter the jury's view of the murder, thus requiring reversal of the death verdict. He argues that "[t]here is a significant difference in moral culpability between [defendant's] murdering the victim while lying in wait and spontaneously erupting in anger when confronted with Maria's resolve to pursue the rape charges." But finding the special circumstance invalid does not additionally mean the jury had to find that defendant simply erupted in anger. The jury clearly found — on good, solid evidence — that defendant intended to kill the victim if and when he learned that she would not drop the rape charge. It clearly, and reasonably, rejected any eruption in anger claim. The only question on which the evidence was insufficient was whether defendant learned Maria would not drop the charges when he spoke with her on the telephone early that morning, or not until she came to his home with a peace offering about an hour later. This insufficiency of the evidence regarding the timing was fatal to the special-circumstance finding, but, in this case, it did not significantly affect defendant's culpability for the murder that, the jury clearly found, he had long intended to commit if Maria did not drop the charge. We see no reasonable possibility that

36

uncertainty about when, exactly, defendant learned she would not drop the charge affected the penalty determination.

We have also assumed the possibility of two additional minor errors: (1) permitting the jury to consider for its truth Maria's statement that defendant had told her that he knew how to manipulate the system, and (2) permitting the jury to consider in aggravation nonviolent acts of obstructing or resisting a peace officer. These possible errors, even considered cumulatively, were not prejudicial.

### 4. Challenges to California's Death Penalty Law

"Defendant reiterates several contentions we have repeatedly rejected. We see no reason to reconsider our previous decisions.

"Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious. [Citation.] 'Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required.' [Citation.] 'CALJIC No. 8.88's use of the words "so substantial," its use of the word "warrants" instead of "appropriate," its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a "presumption of life" does not render the instruction invalid.' [Citation.] 'The trial court was not required to instruct the jury that there is no burden of proof at the penalty phase, and that the beyond-a-reasonable-doubt standard and requirement of jury unanimity do not apply to mitigating factors.' [Citations.] Penal Code '[s]ection 190.3's use of adjectives such as "extreme" and "substantial" in describing mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors.' [Citation.]

37

'The court need not delete inapplicable sentencing factors or instruct that statutory mitigating factors are relevant solely in mitigation.' [Citation.] Intercase proportionality review is not required. [Citation.] California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently. [Citation.] California's use of the death penalty does not violate international law." (*People v. Sánchez* (2016) 63 Cal.4th 411, 487-488, fn. omitted.)

Defendant also argues that the recent high court decision of *Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616], which invalidated Florida's sentencing scheme, also invalidates California's. It does not. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235 & fn. 16.) "The California sentencing scheme is materially different from that in Florida." (*Id*. at p. 1235, fn. 16.)

### III. CONCLUSION

We reverse the lying-in-wait special-circumstance finding and otherwise affirm the judgment.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Becerrada
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S170957
**Date Filed:** April 17, 2017
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** William R. Pounders

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, and Arnold Erickson, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster, David Zarmi and Kimara A. Aarons, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Arnold Erickson
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA  94607
(510) 267-3300

Kimara A. Aarons
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2270