Filed 2/8/22  P. v. Jackson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078403 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CR135952) |
| ROY LEE JACKSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

In 1993, Roy Lee Jackson pled guilty to second degree murder (Pen. Code,[1] § 187, subd. (a)). The court sentenced Jackson to 15 years to life.

Jackson appealed, and we affirmed the judgment in an unpublished opinion, *People v. Jackson*, D020259 (Nov. 7, 1994) (*Jackson I*).

In 2019, he filed a petition for resentencing under section 1170.95, which permits a defendant convicted of murder under a felony-murder theory or the natural and probable consequences doctrine to petition for the conviction to be vacated and to be resentenced. (§ 1170.95, subd. (a).) The superior court assigned Jackson an attorney, concluded Jackson had met his prima facie burden, issued an order to show cause (OSC), and ordered an evidentiary hearing. Following the hearing, the court concluded the People had proved beyond a reasonable doubt that Jackson was a major participant in the underlying robbery who acted with reckless indifference to human life. Accordingly, it found Jackson ineligible for relief and denied the petition.

Jackson appeals, contending the record lacks substantial evidence to support the trial court's conclusion. We conclude substantial evidence supports the court's decision, and we will accordingly affirm.

BACKGROUND AND PROCEDURAL FACTS

On July 2, 1991, gun store owner Gary Gottlieb was shot and killed at his gun shop during a robbery in which the suspects took handguns.[2] The following month, on August 5, 1991, police officers encountered Jackson driving a Datsun that matched the description of the one from the robbery and pulled over his vehicle in a "hot stop," i.e., with weapons drawn. Police

---

[1]    Section references are to the Penal Code.

[2]    The facts of the underlying crime are taken from our unpublished opinion in *Jackson I*, *supra*, D020259.

2

arrested Jackson after secretly recording a conversation between Jackson and his companion in which the two mentioned a gun and drugs were located in the Datsun, evidence which police subsequently located during a search. The handgun matched one taken during the robbery the previous month. Jackson's prints also matched some found on a display case in the gun shop.

Jackson filed a motion to suppress, which the court denied, and Jackson then pled guilty to second degree murder (§ 187, subd. (a)). Jackson stipulated to the use of the transcript of the preliminary hearing as the basis for the plea. The court sentenced him to 15 years to life with the possibility of parole.

Jackson appealed the court's denial of the motion to suppress, and we affirmed the court's decision in *Jackson I*, *supra*, D020259.

On January 9, 2019, Jackson filed a petition for resentencing under section 1170.95. The court appointed counsel, concluded Jackson had met his prima facie burden showing he was not ineligible for resentencing, issued an OSC, and held an evidentiary hearing following briefing.

The People argued Jackson had twice made judicial confessions to being the actual killer and, in the alternative, Jackson was a major participant in the underlying felony.

Jackson testified at the trial and retrial of a coconspirator in 1995 and 1996 that he shot and killed the victim. Also in 1996, Jackson acknowledged shooting the victim to a forensic evaluator interviewing him for parole eligibility and said his motive was robbery.

But Jackson's testimony changed over time. In a parole eligibility evaluation in January 2002, he denied being the actual shooter but admitted to planning the robbery with three others. He said four individuals were involved, and they drove two cars. When they drove to the store, the owner

3

had gone to lunch, so they arranged to meet at the store later. When his vehicle arrived, the two in the other vehicle motioned for them to leave. He did not learn about the murder until he heard about it on the news.

At a parole hearing in April 2002, he testified it was his idea to rob the store. He had been in the gun store previously to purchase some bullets, and he suggested that location. He attempted to enter the store to case it, but the store was closed for lunch, and he wanted to wait to commit the crime while it was open. When he returned, codefendants in the other vehicle told them to leave and later told Jackson they had already robbed the store and a person had been shot. They gave Jackson a gun from the robbery. Jackson also admitted he and his coconspirators were gang members.

In a January 2005 forensic evaluation to determine parole eligibility, Jackson explained he was supposed to participate in the robbery, but the others "jumped the gun," so he did not shoot anyone, though he did get one of the stolen guns.

In July 2007, Jackson testified at a parole hearing that he helped plan the robbery, and that he was going to go in the store to "check[ ] it out" and see "what the process was" and to assess "the number of employees, people and things of that nature." When he went into the store that day to "check[ ] it out," "the man was out to lunch," so he was told to leave. He knew the codefendants were armed and admitted they were all gang members.

In March 2016, Jackson told a parole evaluator that he participated in planning the robbery out of loyalty to the others and to "fit in." He said he was not in the store at the time of the robbery, but he knew it could lead to murder because they had guns and chose vulnerable victims they thought they could overpower.

In his June 2016 parole hearing, Jackson said the statements he had made to the evaluator were accurate. He explained that he and the others discussed committing the robbery the night before. He had a .22 caliber gun with him, which he knew functioned because he had previously fired it, but a codefendant in the second vehicle wanted a bigger gun, so they stopped on the way to the gun store to get a larger weapon. Jackson had been a customer at the store the day before, but he was tasked with casing it to determine who was inside. But when he arrived, a sign on the door said the victim was at lunch, so the group decided to wait for the owner to return. Jackson left, and when he returned a few minutes later, coconspirators in a second vehicle were already leaving the store and told Jackson to leave and follow them, which he did. When the two vehicles arrived in Victorville, Jackson learned the victim had been shot after a struggle. Jackson was upset that they had "jumped the gun" and conducted the robbery without him. Jackson received three guns that had been taken from the store. He testified he had planned and participated as much as anybody, knew death could occur, and was responsible for the murder. He also testified that weapons and death were part of his lifestyle as a gang member.

In April 2019, Jackson participated in another forensic evaluation. He told the evaluator he was personally armed; the store was closed when he arrived, and when he returned later two others were leaving the store and telling him to drive to Victorville, which he did. He said he had participated for financial gain and for social acceptance.

Jackson testified at a parole hearing in July 2019 that he was involved in the planning; he had been in the store earlier in the day to case it, and he was there after the robbery. He explained he had testified to killing the

5

victim earlier because he believed if he did not, the others would kill him or somebody in his family.

Jackson argued there was not enough evidence to demonstrate he was a major participant who acted with reckless indifference.

The trial court "evaluate[d] the evidence as an independent factfinder to determine whether Petitioner is guilty of murder" beyond a reasonable doubt. It concluded the People did not prove beyond a reasonable doubt that Jackson was the actual killer, but after applying factors outline in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), it found beyond a reasonable doubt that Jackson was a major participant, and also that he acted with a reckless indifference to human life. Accordingly, the court denied Jackson's petition. Jackson timely appealed.

DISCUSSION

A. Senate Bill No. 1437 and Section 1170.95

On September 30, 2018, the Governor signed Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437). "The legislation, which became effective on January 1, 2019, addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine by amending Penal Code sections 188 and 189, as well as by adding Penal Code section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in law would affect their previously sustained convictions." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722 (*Martinez*).)

By amending sections 188 (defining malice) and 189 (defining the degrees of murder), Senate Bill 1437 changed "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual

6

killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *Martinez*, *supra*, 31 Cal.App.5th at p. 723.)

Senate Bill 1437 also added section 1170.95. That section provides that "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, former subd. (a).) A petition may be filed when the following three conditions are met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, former subd. (a)(1)-(3); see *Martinez*, *supra*, 31 Cal.App.5th at p. 723.)

If a petitioner files a facially sufficient petition, the trial court appoints counsel and determines whether the petitioner has made a prima facie case for relief under section 1170.95, former subdivision (c). (*People v. Lewis* (2021) 11 Cal.5th 952, 961-962.) In making this decision, the court "should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Id.* at p. 974.)

"If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause [(OSC)]." (§ 1170.95, subd. (c).) The court then holds a hearing within 60 days to determine whether to vacate the murder conviction. (§ 1170.95, subd. (d)(1).) At this stage of the proceeding, the prosecution has the burden of proving "beyond a reasonable doubt[] that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3); *Martinez*, *supra*, 31 Cal.App.5th at pp. 723-724.)

## B. Standard of Review

We review challenges to the sufficiency of the evidence for substantial evidence. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["A judgment will not be reversed so long as there is substantial evidence to support a rational trier of fact's conclusion . . . ."]; see *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320; see, e.g., *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1096 [orders denying resentencing under section 1170.18].) In so doing, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *Banks*, *supra*, 61 Cal.4th at p. 804), and we do not substitute our own factual determinations for the factfinder's. (*Koontz*, at p. 1078.)

## C. Major Participant

Jackson contends the record lacks substantial evidence to support the court's finding that he was a major participant. We consider the following factors when determining whether a defendant was a major participant: (1) the defendant's role in planning the crime that lead to the victim's death;

8

(2) the defendant's role in supplying lethal weapons; (3) the defendant's awareness of particular dangers posed by the crime, weapons, or past conduct of the other participants; (4) the defendant's presence at the scene of the crime; (5) whether the defendant was in a position to facilitate or prevent the killing; (6) whether the defendant's actions or inactions played a particular role in the defendant's death; and (7) the defendant's actions after the lethal conduct. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Courts weigh the factors to determine whether the defendant's participation in the crime carried a " 'grave risk of death' " and was sufficiently significant to be considered " 'major,' " but no single factor is necessary or sufficient. (*Ibid.*)

To argue he was not a major participant, Jackson compares his case to *In re Ramirez* (2019) 32 Cal.App.5th 384 (*Ramirez*) and *In re Bennett* (2018) 26 Cal.App.5th 1002 (*Bennett*).

In *Ramirez*, the petitioner's two friends were carrying weapons to protect themselves from members of a rival street gang when they rode their bicycles to a grocery store. (*Ramirez*, *supra*, 32 Cal.App.5th at p. 389.) They ran into Candido, a mutual friend, who invited them to "go jacking," to which Ramirez replied either "Do whatever you guys want" or "whatever we want to do." (*Id.* at pp. 389-390.) The group went to Candido's house so Candido could get a shotgun, but Candido was unable to procure one from home, and they left on their bicycles and went in search of someone to rob. (*Id.* at p. 390.) Candido traded a stun gun he had for a .32 caliber weapon one of the other friends had. (*Ibid.*) Then, when the group arrived outside a bar, Candido told them that was the place and gave his bicycle to Ramirez to hold. (*Ibid.*) Candido and one of the friends approached a truck, and the other friend heard them say "Give me your money" before a series of gunshots. (*Ibid.*) Candido and the other friend returned, and as the four road off on

9

bikes, Candido saw someone lying on the ground.  (*Ibid.*)  The victim suffered six gunshot wounds from two weapons and died in the parking lot.  (*Id.* at pp. 390-391.)

The court in *Ramirez* allowed for the following inferences:  Ramirez supplied the guns, though not in contemplation of committing a crime.  (*Ramirez, supra*, 32 Cal.App.5th at p. 404.)  He agreed with the suggestion of robbing someone and was aware it would be an armed robbery.  (*Ibid.*)  He waited for a victim to appear and drove a getaway vehicle after the shooting.  (*Ibid.*)  He heard what had occurred as it happened, though he was not in the immediate location of the crime.  (*Ibid.*)

The court emphasized that there was no evidence a killing was contemplated; it appeared the shooting was in response to the victim resisting and then hitting the perpetrator.  (*Ramirez, supra*, 32 Cal.App.5th at p. 404.)  Further, there was no evidence of planning the robbery because Ramirez simply went along with the group.  Nor was there evidence Ramirez was close enough to restrain the crime or the others.  (*Id.* at p. 405.)  And although a jury could infer Ramirez was part of a gang, it was not sufficient information to indicate whether he knew the history of any of his cohorts well enough to know if they were violent.  (*Ibid.*)  It concluded Ramirez's contributions and participation were not substantial.  (*Ibid.*)

In *Bennett, supra*, 26 Cal.App.5th at pages 1008-1009, four friends were hanging out when one told the others he needed a "lick" (slang for committing robbery) for money, and another told Bennett he needed drugs and asked where he could get some.  Bennett commented he could "make a killing" by selling drugs, but another suggested they just steal the drugs.  Bennett then called someone he considered a reliable source of drugs and asked that person for two ounces of cocaine.  Bennett usually met the victim at a carwash across

the street from the victim's apartment complex. When Bennett arrived at the carwash with his two companions, Bennett called the victim, who said he would head over. Bennett stayed at the carwash and the other two walked across the street. Resident witnesses reported that they saw the victim running as Bennett's friends chased after, shooting at the victim. Bennett's companions took the drugs from the victim and returned to the carwash. When police arrived, the victim was unresponsive; he died in transit to the hospital.

Bennett and his two friends called the fourth friend and told him they " 'got the dope' " and said he should have joined them. Later, Bennett also told his friends that they were not supposed to shoot the victim, just take the drugs. (*Bennett, supra,* 26 Cal.App.5th at p. 1009.)

The Court of Appeal explained there was no evidence Bennett supplied the guns, though it is reasonable to infer he knew about them. (*Bennett, supra,* 26 Cal.App.5th at p. 1020.) It also noted it could infer Bennett was walking across the street to join his friends when they came running back, and there was nothing to indicate he did anything to mitigate the possibility of violence and he helped the group escape. (*Ibid.*) The court summarized the facts: "Bennett drove the group to Irvine from Oceanside and waited across the street while Turner and Smith went to meet Gary. While Bennett may have been aware his confederates were armed, there is no evidence the robbery was predicated on shooting Gray. . . . Bennett's plan fell apart when Gray started running instead of complying, and his cohorts chased Gray down and killed him to complete the robbery. But there was no evidence Bennett or the others planned a murder. Indeed, Bennett's statements to police after the crime show it was the farthest thing from his mind." (*Ibid.*)

11

It concluded Bennett's involvement was not substantial and so he was not a major participant. (*Id.* at p. 1021.)

Like Ramirez and Bennett, Jackson did not supply weapons to his companions, and Jackson did not initiate the idea of committing robbery. However, unlike Ramirez, who simply went along with friends, Jackson suggested the location. He had been in the store earlier, which is how his prints had been identified. And while it is not entirely clear whether he cased the store immediately before it closed for lunch as he had intended, we can infer that he shared information about the store layout and employees with his cohorts.

Further, unlike Bennett, whose comments indicated murder was the farthest things from his mind when he set up the meeting between the dealer and his friends (*Bennett, supra,* 26 Cal.App.5th at pp. 1009, 1020), Jackson said he knew the robbery could lead to murder because they brought guns and chose vulnerable victims. He repeatedly stated he knew death could occur during the robbery, and he was present when the others stopped to get a bigger gun to use during the robbery. Thus, unlike Bennett, Jackson was not surprised a murder occurred during the robbery; he had planned for such a possibility. Moreover, although he was not present when the murder occurred, unlike Ramirez and Bennett, Jackson had an opportunity to prevent the crime because the store was unoccupied when the group first arrived, and instead of burglarizing the store when no victims were present, Jackson and the others agreed to wait for the owner to return. The only reason Jackson was not present at the robbery and murder was because the other car arrived first and "jumped the gun," about which he felt upset.

Jackson was heavily involved in planning the robbery: he suggested the location; he had information from previously being in the store; he carried

a weapon for use against vulnerable victims; he went with others to get an even bigger gun; he planned to case the store immediately before the robbery; he left and returned so that he could participate directly in the robbery; and he felt upset the others "jumped the gun" to rob the store without him. Accordingly, there is substantial evidence to support the court's conclusion that Jackson was a major participant whose participation carried a grave risk of death. (See *Banks*, *supra*, 61 Cal.4th at p. 803.)

### D. Reckless Indifference

To demonstrate a reckless indifference, a "defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed" and also consciously disregard "the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; see *Clark*, *supra*, 63 Cal.4th at pp. 616-617.) We consider the following factors in determining whether substantial evidence supports the trial court's conclusion that Jackson acted with reckless indifference to human life: (1) knowledge of weapons and use and number of weapons, (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim, (3) duration of the felony, (4) the defendant's knowledge of the other perpetrators' likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, at pp. 618-623.) No single factor is necessary or sufficient to determine a recklessly indifferent state of mind. (*Id.* at p. 619.) Further, because of the overlap between the factors assessing whether a defendant is a major participant and whether the defendant acted with reckless indifference, the greater a defendant's participation in the felony murder, the more likely it is that he acted with reckless indifference. (*Id.* at pp. 614-615.)

13

Two of the factors did not weigh in the court's conclusion: Jackson's presence at the scene and the duration of the felony. (See *Clark*, *supra*, 63 Cal.4th at pp. 619-623.) But substantial evidence supports the court's conclusion that other factors demonstrate Jackson was aware of and willingly involved in the robbery and consciously disregarded the significant risk of death his actions created.

Although Jackson contends there was no evidence the group planned to kill the victim, there is no requirement that there be a plan to murder. And the evidence is replete with admissions that Jackson was aware of and willingly involved in the robbery and the manner in which the robbery occurred. Jackson explained that he knew murder could happen because they selected vulnerable victims they thought they could overpower, and they brought guns with them for the purpose of robbing the store. While general knowledge may not suffice to demonstrate reckless indifference (*Clark*, *supra*, 63 Cal.4th at pp. 619-623 [risk of death alone not sufficient to establish reckless indifference]), Jackson's knowledge went further.

He had specific knowledge of the number and types of weapons, stating he knew his codefendants were all armed. The group even stopped on the way to rob the store so that a codefendant could pick up a bigger gun, indicating that the group needed "big" weapons to complete the robbery, increasing the risk of harm to victims. He testified he knew weapons were involved and death could occur, and he implied an awareness of the dangerousness of his cohorts by admitting that the use of weapons and the risk of death were part of his lifestyle as a gang member. Jackson himself carried a .22 caliber gun, showing his willingness to be involved in the violent manner of the crime. He undertook no efforts to minimize the risk of violence during the robbery, including by waiting for the victim to return rather than

14

burglarize a store without occupants. Instead, the group left and returned so that they could rob the store when victims were present, increasing the risk of death; ensured all the participants in the crime were armed; took time to get a larger weapon; and selected victims they could overpower. Jackson's actions show both an objective and a subjective reckless indifference that offer substantial evidence to support the trial court's conclusions.

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.

15