Filed 12/14/22  P. v. Fryklind CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAUL JOSHUA FRYKLIND,<br><br>    Defendant and Appellant. | D079617<br><br><br>(Super. Ct. No. SCD220343) |

APPEAL from an order of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Erica Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

In 2010, a jury convicted Paul Fryklind of second degree murder for his role in a March 2008 gang-related shooting that resulted in the death of Ramon B. and injuries to two others.  In 2019, following California's adoption of Senate Bill No. 1437 (2017-2018 Reg. Sess.), Fryklind petitioned the

superior court for resentencing, alleging he was not the actual killer or a major participant who acted with a reckless disregard to human life, and he did not act with intent to kill. (See Pen. Code,[1] § 1172.6.) The court denied the petition without issuing an order to show cause, and we reversed its decision on appeal. (*People v. Fryklind* (Feb. 25, 2021, D077856) [nonpub. opn.].) On remand, the superior court issued an order to show cause and held a hearing in compliance with section 1172.6. It concluded that the People proved beyond a reasonable doubt that Fryklind had committed second degree implied malice murder, and it denied the petition for resentencing.

On appeal, Fryklind contends that there was not substantial evidence to support the denial of his petition, and that the court erred by failing to explicitly consider his youth at the time of the offense. We conclude that substantial evidence supports the court's denial, and the lack of explicit consideration of Fryklind's age was not error here. Accordingly, we affirm.

BACKGROUND AND PROCEDURAL FACTS

A. *The Underlying Crime*

Ramon was associated with the Varrio Encanto Locos criminal street gang. In February 2008, Ramon and his girlfriend Christina R. moved into a trailer park that was located in a territory the Southeast Locos criminal street gang claimed.

In March 2008, Domingo Valente and Edwin Rendon, who associated with the Southeast Locos gang, along with a third person, confronted Ramon outside his trailer. Valente asked Ramon where he was from, and Ramon answered, "Encanto." Valente said, "Well, this is Southeast Locos," and he pulled a knife on Ramon. They fought; Ramon kicked at Valente, and the Southeast Locos ran off.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

On March 31, 2008, Ramon and Christina ran into Ramon's old friend Edgar M. and two sisters, Daisy and Yeimi H. They all met up later that day in a park to drink beer, and then they decided to go to Howell's liquor store to purchase more alcohol. Howell's was located in the Encanto neighborhood, the territory of the gang in which Ramon had been a member.

As the group walked to the store, a car passed them. In it, Valente, who was a passenger, flashed a gang sign with a gloved hand.

The group continued on to the liquor store and three men, Fryklind, Valente, and Rendon, walked toward them. A security camera captured Valente walk toward Ramon while Fryklind and Rendon continued on the sidewalk. Someone in Ramon's group yelled a gang challenge, something to the effect of, "Where you fools from? This is Encanto." Edgar felt like something was going to happen, and he tried to get his friends inside the liquor store; Daisy went with him.

Valente challenged the group: "Where you fools from?" Ramon began walking backward toward the liquor store entrance. Valente removed a gun from his sweatshirt and fired repeatedly. Five bullets hit Ramon, causing his death, and additional bullets hit Christina in the arm and Yeimi in the lower back. Valente, Fryklind, and Rendon ran back to their car, and Fryklind drove them away.

### B. *The Investigation*

San Diego Police Detective Jana Beard interviewed Fryklind twice, and both times he denied any knowledge of or involvement in the shooting. However, Fryklind admitted he "kicked in" the trailer park and said he had known Ramon for several years.

3

Shortly after the shooting, Fryklind went to see Oscar N.[2] to ask for advice. Oscar was a "shot-caller" and an advisor to young members of the Southeast Locos gang. Fryklind told Oscar that he and the others "rolled up to a liquor store, and these dudes in the liquor store started mouthing off . . . ." Fryklind told Oscar: "We were walking away. We're going to go fight, you know, around the corner in the back of the liquor store[.] [W]e're going to get down, and then [Valente] was standing there, and when we walked by, [he] was in the shadows. These other dudes started walking up, and [Valente] just started shooting out of nowhere and killed a kid, I guess." He told Oscar they "all took off," but he worried police caught the car on camera.

Oscar advised Fryklind to get rid of the gun. Fryklind said, "Man, I paid $700 for that thing. That's my baby, you know." Although Fryklind did not want to get rid of the gun, after Oscar explained that Fryklind could get busted keeping a "hot gun," Fryklind agreed to take care of it.

Fryklind initially gave the gun to his girlfriend, but he allowed other gang members to use it as necessary. Police later found the weapon during an unrelated search of Roberto Benitez's residence; Benitez was a member of the Southeast Locos gang. A ballistics analysis confirmed it was the weapon used in the shooting.

Oscar subsequently entered an agreement with law enforcement to act as an informant, and he wore a wire when working with police. The wire

---

[2] The People's return to order to show cause explains in footnote 8 that although Oscar was identified at trial and testified, he was relocated with his family for safety. The People did not identify him by name in their briefing before the superior court and requested he not be identified by name throughout the remainder of the proceedings. Accordingly, we refer to him only by first name and last initial.

captured two conversations between Fryklind and Oscar. On February 2, 2009, Fryklind told Oscar that detectives had visited him twice and informed him that others were "snitching." Fryklind said he knew the gun police found matched the gun used in the shooting, and he was afraid the police would find his DNA on the weapon because he blew into the barrel. Oscar told Fryklind that police said they had Fryklind's fingerprints on the gun, and Fryklind wondered how the police knew who the three people involved were because he could not be seen on the video.

On February 11, 2009, in the presence of others, Fryklind told Oscar about the shooting, stating, "[t]hat was the day it was me, [Valente] and [Rendon] that did that shit." He told Oscar, "[W]e smoked that fool right there." Oscar confirmed "smoke" meant "kill."

The State charged Fryklind with murder (§ 187, subd. (a); count 1), attempted murder with premeditation and deliberation (§§ 187, subd. (a) & 664; count 2), and with two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 3 and 4). It also alleged Fryklind was a principal in the offenses and that at least one principal used a firearm and caused great bodily injury and death to another person (§ 12022.53, subds. (d), (e)(1)). The information also alleged that the crimes were committed to benefit a criminal street gang. (§ 186.22, subd. (b)(1).)

## C. *Trial*

At trial, San Diego Police Detective Damon Sherman testified as a gang expert and explained the Southeast Locos and the Varrio Encanto Locos were gangs with territories that bordered each other. The trailer park was claimed by the Southeast Locos, and Howell's liquor store was claimed by the Varrio Encanto Locos. Sherman testified that gang members would often arm themselves before entering rival territory and opined that gang members

5

were expected to "back up" associates if needed. He testified that if a Southeast Locos member lost a fight against a rival while in his own territory, the member would likely retaliate violently to help improve his reputation. He also testified that challenged gang members would plan their retaliation, and that it was common for armed Southeast Locos gang members to use those weapons if a fight broke out.

In addition to testifying about his conversations with Fryklind, Oscar testified that Southeast Locos relied on each other for backup, which meant assisting each other.

Christina believed that if you fought one Southeast Locos gang member, you would become an enemy to all members of that gang.

On October 12, 2010, the jury found Fryklind guilty of counts 1, 3, and 4. It also found him guilty of the gang enhancement and the weapons enhancement. The trial court sentenced Fryklind to an indeterminate term of 40 years to life for count 1, plus 14 years 8 months, to run consecutively, for counts 3 and 4.

## D. *Petition for Resentencing*

Fryklind filed a petition for resentencing pursuant to section 1172.6 on February 4, 2019. The court denied that petition without issuing an order to show cause, and Fryklind appealed. We reversed the denial and directed the superior court to issue an order to show cause and conduct further proceedings, as required by statute.

On May 10, 2021, the superior court found that Fryklind met his prima facie burden for resentencing under section 1172.6 and ordered the People to show cause why relief should not be granted. The People filed a return to that order, and Fryklind filed a reply brief. The court held an evidentiary hearing at which it heard arguments from the People and Fryklind.

6

At that hearing, the People argued that Fryklind was a direct aider and abettor who acted with implied malice; he supplied the gun for Valente to use and stood as "backup" during the shooting; he fled with the shooter and drove the group away from the area; he took back his gun after the shooting. Fryklind's attorney argued that the evidence did not prove beyond a reasonable doubt that Fryklind manifested intent to kill or that he aided and abetted with a conscious disregard for human life. He also mentioned that Fryklind was 20 years old[3] and "by personality," he was "a follower, not a leader." Defense counsel said that Fryklind "was a kid. He was an immature, trusting kid who grew up in a culture of bravado and bragging, and he's a small guy who has to talk big so that he doesn't get beaten up, and that's what this is."

The parties stipulated to the admission of the trial record as well as the appellate transcripts from the trial that resulted in conviction.

The court acted as an independent trier of fact and evaluated whether the evidence proved beyond a reasonable doubt that Fryklind was guilty of murder. It reviewed the original petition, the People's return to order to show cause, the petitioner's evidentiary hearing brief and argument, the trial record, exhibits the parties tendered, and the parties' arguments. It did not consider any case-specific hearsay statements upon which an expert had based an opinion.[4]

The court denied Fryklind's request for resentencing and issued a written statement of decision. It applied the theory of implied malice second degree murder to Fryklind's case. It found that Fryklind possessed the

---

[3]    Fryklind was 19 years old at the time of the crime.

[4]    The court found no evidence of "case-specific" hearsay in the record.

weapon before the shooting, supplied the gun to the shooter, and fled with the shooter. It relied in part on Detective Sherman's testimony to conclude that Fryklind was aware of the previous confrontation between Valente and Ramon, members of rival gangs, and that Fryklind knew entering the rival territory "would almost certainly lead to a violent confrontation involving deadly weapons." It found that Fryklind knew that Valente would violently confront Ramon with the gun.

Fryklind timely appealed.

## DISCUSSION

### A. *Legal Principles*

#### 1. Senate Bill No. 1437 and Senate Bill No. 775

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was enacted to " 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) Senate Bill 1437 did this by amending section 188, which defines malice, and section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, §§ 2 & 3.) Amended section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Amended section 189 states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer.

8

[¶] (2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] [or] (3)  The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Senate Bill 1437 also established resentencing relief for eligible defendants.  (§ 1172.6, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 707-708.)  Under subdivision (a), "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition" with the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts "when all of the following conditions apply: [¶] (1)  A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2)  The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3)  The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" under Senate Bill 1437.  After receiving a petition containing the required information, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Strong*, at p. 708, citing § 1172.6, subd. (c).)  If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing.  (§ 1172.6, subds. (c), (d)(3).)

9

Effective January 1, 2022, Senate Bill No. 775 (2020-2021 Reg. Sess.) (Senate Bill 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California law as amended by Senate Bill 1437 and (2) "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1, subd. (c).)  Senate Bill 775 clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill 1437.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 294, 297 (*Clements*); see also *People v. Garrison* (2021) 73 Cal.App.5th 735, 745, fn. omitted [the trial court acts as "an independent fact finder, to determine beyond a reasonable doubt whether defendant is guilty of murder under a valid theory of murder"].)

2.  Implied Malice Aiding and Abetting Murder

Although Senate Bill 1437 amended the felony murder rule to ensure that murder liability would be imposed only on perpetrators with malice aforethought, it did not change the definition of malice. (*People v. Gentile* (2020) 10 Cal.5th 830, 844.)  Express malice exists "when there is a manifest intent to kill." (*Ibid.*, citing § 188, subds. (a)(1) and (2).)  It is shown when the defendant either desires the victim's death or knows to a substantial certainty that death will occur.  (§ 188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114.)  Implied malice exists if "someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart.' " (*Gentile*, at p. 844, citing § 188,

subd. (a)(2).) " 'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)

Aider and abettor liability is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*), quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) In other words, " '[a]n aider and abettor must do something *and* have a certain mental state.' " (*Powell*, at p. 712.) "For the direct aider and abettor, the [act] includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Id.* at p. 713.) Further, "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Id.* at p. 714.)

B. *Standard of Review*

We review the trial court's fact finding on the question of whether a defendant committed a murder under a still-valid theory for substantial evidence. (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.) "Our job on review is different

11

from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, at p. 298.) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

## C. *Fryklind's Intent*

At issue is whether Fryklind acted in a way that demonstrated an awareness that he was " 'engaging in conduct that endangers the life of another ' " (*Cravens, supra*, 53 Cal.4th at p. 507), and that he acted "with conscious disregard for human life" (*Powell, supra*, 63 Cal.App.5th at p. 714). Fryklind contends that there was insufficient evidence to establish subjective intent that he intended to aid in an act that had a high probability of death or acted with a conscious disregard for the danger of life that the act poses because, he maintains, there is no evidence that he knew Valente would shoot Ramon. We disagree; there is substantial evidence from which a reasonable trier of fact could conclude that Fryklind acted with implied malice.

12

As a member of the Southeast Locos gang, Fryklind understood that after Valente lost the fight within his gang's territory, at the trailer park, he would have to retaliate to improve his reputation. Such a retaliation would be planned, and if the gang members had weapons, they would use those weapons in a fight. Moreover, Fryklind allowed other gang members to use his gun as necessary. Thus, it is reasonable to infer that when Fryklind gave his gun to Valente, he understood that if Valente were in a fight, the gun would be used. Sharing his gun with Valente demonstrated a conscious disregard for human life because such a fight would have endangered the life of Ramon and his friends.

Further, Fryklind had knowledge that something dangerous was about to happen. He was in the vehicle when it first passed Ramon's group, and a passenger in his vehicle flashed a gang sign, even though they were near rival territory. Thus, he was in the vehicle when it stopped so the passengers could confront Ramon on foot, and Fryklind accompanied Valente to approach Ramon's group. Fryklind knew something dangerous was going to happen; he later told Oscar he had planned to participate in a fight in the back of the liquor store; they were going to "get down." And there was testimony that as a gang member, Fryklind would have understood that confronting a rival gang member in that rival's territory would likewise bring with it an increase in the risk of violence and that Southeast Locos members would discuss a plan of retaliation against a rival. As Christina had noted, because Ramon fought one Southeast Locos gang member, he was an enemy to them all.

The tone of the exchange between the rival groups likewise suggests Fryklind knew he was participating in the commission of a life-endangering

act; Ramon's friend Edgar testified that he could sense something was going to happen. This was why he attempted to bring their group inside the store.

Fryklind's own comments also provide substantial evidence that he acted with a conscious disregard for human life. When he discussed the crime with Oscar, his tone was callous. Shortly after the shooting, Fryklind's concern was not that the group shot or killed anyone. Instead, his focus was on his gun, which he described as his baby. He did not want to get rid of it. In that conversation, his initial description of the crime likewise showed indifference to Ramon's life. He told Oscar that Valente "just killed a kid, I guess." In a later conversation, he bragged about his role, claiming responsibility for participating in the shooting, telling Oscar, "that day it was me, [Valente] and [Rendon] that did that shit . . . [W]e smoked that fool right there." These comments reflect his indifference and callousness.

Fryklind's arguments rely on inferences drawn in his favor, focusing on timing of events to suggest there was not sufficient evidence of a subjective conscious disregard for human life. However, when we view these facts in a light most favorable to the order, they support the court's finding that Fryklind aided and abetted an implied malice murder. We therefore conclude that the trial court did not err in denying Fryklind's section 1172.6 petition.

### D. *Fryklind's Age*

Fryklind contends the court erred by failing to consider his youth at the time of the offense. He maintains that this consideration would separately have led to the conclusion that he did not act with the requisite intent. We disagree.

We observe that the California case law upon which Fryklind relies holds that youth at the time of the offense is a relevant factor in determining

14

whether a defendant is a major participant in a crime and has acted with reckless indifference to human life. It does not hold that courts are required to consider youth as a factor in evaluating whether a direct aider and abettor has acted with a conscious disregard for human life, the relevant question before us. (See *In re Harper* (2022) 76 Cal.App.5th 450, 470-472 [determining the 16-year-old offender acted with a reckless disregard for human life]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-992 [addressing whether the 15 year-old defendant acted with reckless indifference to human life]; *In re Moore* (2021) 68 Cal.App.5th 434, 453 [finding insufficient evidence that 16 year-old defendant acted with reckless indifference to human life and recognizing children generally less mature and responsible than adults].)

Even if there were case law supporting Fryklind's contention that courts should consider defendants' youthfulness and maturity in evaluating whether they acted with a conscious disregard for the risks attendant to their conduct, Fryklind does not point us to any evidence in the record that indicates his chronological age reflected immaturity. He did not argue in his resentencing briefing that his actions were the result of a lack of brain development. Our review of the record does not uncover any evidence by experts regarding brain development; nor did we discover evidence in the record regarding Fryklind's maturity at the time of the crime.

Fryklind's attorney argued at the resentencing hearing that Fryklind was 20 years old and "by personality," he was "a follower, not a leader." Defense counsel also argued that Fryklind "was a kid. He was an immature, trusting kid who grew up in a culture of bravado and bragging, and he's a small guy who has to talk big so that he doesn't get beaten up, and that's what this is." But none of that argument directs us to evidence Fryklind's youth impeded his ability to appreciate the risks associated with his conduct.

15

There is simply nothing in the record before us that indicates youth played a factor in the crime here at all.

DISPOSITION

The order denying the petition for resentencing is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.