Filed 4/7/23

CERTIFIED FOR PUBLICATION
COURT OF APPEAL, FOURTH APPELLATE DISTRICT
DIVISION ONE
STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BOUNTHANOM DIDYAVONG,<br><br>    Defendant and Appellant. | D079712<br><br>(Super. Ct. No. SCD142894) |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Kimberly J. Grove and Pauline E. Villanueva, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lynne G. McGinnis, Melissa Mandel, Robin Urbanski, Alan Amann, and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In February 2001, a jury convicted Bounthanom Didyavong of first degree murder for his role in the 1998 gang-related beating and shooting death of David D.  In May 2019, following California's adoption of Senate Bill No. 1437 (2017-2018 Reg. Sess.), Didyavong petitioned the superior court for

resentencing, alleging he was not the actual killer or a major participant who acted with a reckless disregard to human life, and he did not act with intent to kill. (See Pen. Code,[1] § 1172.6.[2]) The superior court denied the petition at the prima facie stage. We reversed the denial and directed the superior court to issue an order to show cause. (*People v. Didyavong* (Apr. 14, 2021, D077933) [nonpub. opn].) On remand and following a hearing that complied with section 1172.6, the superior court concluded that the People proved beyond a reasonable doubt that Didyavong committed second degree implied malice murder. It denied the petition for resentencing. Didyavong appealed that determination, contending there was not substantial evidence to support the court's conclusion.

We requested supplemental briefing as to whether a trial court could reduce a first degree murder conviction to second degree murder in the context of a section 1172.6 evidentiary hearing. In his supplemental brief, Didyavong argued that the trial judge should have reduced the count and resentenced him because it determined the evidence was sufficient to find him guilty of second degree murder on that basis. The Attorney General argued that section 1172.6 does not provide a mechanism for reducing a first degree murder conviction to second degree murder; thus, the proper approach was for the court to deny the petition, as it did.

We agree with the Attorney General that section 1172.6 does not provide a mechanism to reduce a first degree murder conviction to second

---

[1] Undesignated section references are to the Penal Code.

[2] Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6 with no change in text. (Stats. 2022, ch. 50, § 10.) We refer to the statute by its current number only.

degree murder.  We further conclude there was substantial evidence to support the court's denial of Didyavong's petition.  Thus, we affirm.

BACKGROUND FACTS

We recite the facts as they appear in our unpublished decision on Didyavong's direct appeal (*People v. Didyavong* (July 30, 2002, D037601)):

"On the evening of September 12, 1998, Ryan L[.] had a party at his residence on Bell Bluff Avenue in San Diego.  Roughly 25 to 30 teenagers were at the party.  About 11:30 p.m., a number of the teenagers were outside when Osa Inthavong passed them in his white Honda Civic hatchback.  Jordan W[.], who had been drinking, was angered because he perceived that the Honda swerved toward the group and he kicked the front passenger side fender of the car as it passed.  Mistakenly thinking he knew the driver, [Jordan] ran after the car, which stopped briefly and then drove off.

"About an hour later, Inthavong drove the Honda back to Bell Bluff Avenue, followed by several other vehicles, and stopped in the middle of the street.  Fifteen to twenty Asian men got out of the cars and a tall one, wearing a white shirt and baggy blue pants and sporting a distinctive hairstyle, took a small baseball bat[3] out of the trunk of the Honda.  Six or seven of the Asian[ ] [men] surrounded partygoer David [D.], who was across the street smoking a cigarette, and attacked him.  The rest of the Asian [men] formed a shield around the attackers, who were holding [David] down on the ground; one of the attackers used a miniature baseball bat, and another used a lead pipe, to beat [David].

---

3    The size of the baseball bat was disputed during the hearing on the petition for resentencing.  Didyavong's attorney argued it was a "miniature wooden little league bat."  The People replied that the bat was roughly 12 inches long.

3

"When the other teenagers started coming outside to see what was happening, one of the Asian[ ] [men] challenged them, asking if anyone else 'wanted any of what they had.' No one responded. As the attackers held [David] down, one of the Asian[ ] [men] at the center of the group fired five or six gunshots, causing the partygoers to scatter or seek cover. The assailant with the bat hit [David], who was lying in the street, in the head one last time as the rest of the Asian[ ] [men] ran back to their cars. The attacker rejoined the rest of his group, which then drove away.

"[David] was unconscious and did not respond to efforts by the partygoers, or subsequent attempts by paramedics, to revive him. He was transported to a hospital, where he was pronounced dead at 1:27 a.m. An autopsy showed that he died from two gunshot wounds to the chest that damaged his heart, lungs and liver. He also suffered a third gunshot wound, a skull fracture and six puncture wounds consistent with having been stabbed with a Phillips-head screwdriver. Police investigating the scene found a metal pipe in the grass, a baseball bat hidden in the bushes and five shell casings on the ground.

"Shortly thereafter, the police arrested Sonxai Rasakhamdee, Phonemala Phomthavong and Didyavong, who were affiliated with an Asian gang called the OKB, in connection with the incident. Officers interviewed Rasakhamdee and Phomthavong, who admitted their participation in the attack and also indicated that Didyavong had been involved. (The evidence of these interviews was not introduced at Didyavong's trial.) Thereafter, the police put Didyavong and Rasakhamdee together in a holding cell at the police station. The men had a conversation, surreptitiously recorded by police, in which Didyavong urged Rasakhamdee to recant Rasakhamdee's prior statements to the police implicating him in the incident.

4

"Several days after the incident, a friend of [David]'s who witnessed the attack gave a description of the bat-wielding assailant to the police. The witness subsequently chose Didyavong's photo, taken at the time of arrest, from an 18-item photographic lineup and identified Didyavong based on his clothing, physical build and hairstyle as the person who used the bat. The witness also chose a photograph of OKB member Phitikhoun Phanbandith, who he identified as one of the people that he saw get out of the Honda.

"In June 1999, the District Attorney charged Didyavong with murder. (Prosecutors also charged Phanbandith, Inthavong, Rasakhamdee, Phomthavong and several others with murder in connection with the attack.) Phomthavong reached an agreement with prosecutors to plead guilty to voluntary manslaughter arising out of [David]'s death and to testify truthfully in the criminal trials against the other defendants, in exchange for a maximum sentence of 11 years in prison. Although he had repeatedly lied to police, investigators and his own attorney about the incident, he decided to provide truthful testimony because he felt badly about what had happened.

"At Didyavong's trial, Phomthavong testified that on the evening of the attack, he was 'hanging out' by a canyon with several other members and affiliates of the OKB or a closely allied gang known as the Oriental Mobster Crips ('OMC'). Inthavong, who was driving his Honda Civic, stopped to tell the group that a white guy had kicked his car and said[,] '[L]et's go get him.' Most of the group got into five cars and followed Inthavong to Bell Bluff Avenue. Phomthavong drove Didyavong and Didyavong's cousin in his car. Phomthavong testified that he believed that the group was going to Bell Bluff Avenue only for a fistfight; however, he admitted that he had a gun in the glove compartment of his car for safety reasons. He testified that

Rasakhamdee and Phanbandith were the only other members of the group who knew about the gun.

"When the group arrived at Bell Bluff Avenue, Inthavong got out of his car and hit [David]. Shortly thereafter Phanbandith, Didyavong and two or three others joined in the attack, kicking and beating [David], while the others stood around. Phanbandith separated from the attackers and asked Phomthavong where the gun was; Phomthavong responded, "You know where it is." Phanbandith retrieved the gun from Phomthavong's car, approached the group of attackers as they were beating [David], shot [David] three times and then fired several more shots at the other partygoers. The group ran back to the cars and left.

"San Diego Police Department Gang Detective Michael Gallivan testified for the prosecution as an expert on Asian gangs, as follows: Based on Didyavong's attire on the night of the attack (which was consistent with OKB gang colors) and his past affiliations, it appeared that he was an OKB member. Respect is very important to the OKB and the OMC. If a person showed disrespect to a member of these gangs, the gang would feel compelled to retaliate in some fashion, often a violent confrontation, because a failure to respond would be seen as a sign of weakness. If a person kicked an OKB gang member's car, this would be a sign of disrespect, or a challenge, that would require a response. The people who went along with the gang member would be expected to participate in the response in some manner, either through direct involvement or support through their presence at the scene. A beating of the type involved here, including the use of weapons, was a typical gang response to the perceived disrespect that had been shown, although an attack resulting in a death would be a 'severe' response and one that 'doesn't happen every day.'

"In his defense, Didyavong called retired professor emeritus Malcolm Klein, who testified that Asian gang members are most commonly involved in minor offenses (such as theft, vandalism and drugs), rather than more serious offenses (such as robbery, auto theft, rape or murder). Dr. Klein also testified that a shooting would not be an expected response to someone having kicked a gang member's car and that it would be inappropriate to expect that an assault would result in a homicide. Didyavong's father testified that he did not recognize the shirt his son was wearing at the time of his son's arrest.

"A jury convicted Didyavong of first degree murder and, after he made various unsuccessful posttrial motions, the court sentenced him to 25 years to life."

PROCEDURAL HISTORY

In May 2019, Didyavong filed a petition for resentencing under section 1172.6. The court appointed counsel and received briefing. After considering the record of conviction and this court's previous opinion, the superior court concluded Didyavong failed to state a prima facie case for relief and denied his petition.

Didyavong appealed, contending the court engaged in impermissible judicial factfinding. The Attorney General agreed, and we accepted the People's concession. In April 2021, we reversed the superior court's order, remanding the matter with directions to issue an order to show cause and to conduct further proceedings as required by statute.

On remand, the superior court conducted an evidentiary hearing. (See § 1172.6, subd. (d).) The People introduced three theories of liability: aiding and abetting in first degree murder, second degree murder via direct action

with implied malice, and aiding and abetting in second degree murder committed by a fellow gang member.

The court considered the trial record and transcript, the appellate opinion in case No. D037601, and counsels' arguments. Its order also quoted from the opinion in case No. D077933: "Dr. Klein acknowledged that he had no specific information on Asian gangs in San Diego, had never spoken to an Asian gang member from San Diego, had never done research on Asian gang members in San Diego, and was not familiar with a number of other shootings that had occurred in San Diego between Asian gangs."

The superior court denied the petition, concluding the People proved beyond a reasonable doubt that Didyavong was guilty of murder as an aider and abettor under an implied malice theory. The court did not explicitly reach a conclusion regarding first degree murder.

Didyavong timely appealed.

We invited the parties to provide supplemental briefs on the issue of whether the superior court has the authority, under section 1172.6, to reduce a first degree murder sentence to second degree and resentence the defendant for the lesser offense.

## DISCUSSION

### A. *Legal Principles*

#### 1. Senate Bill No. 1437 and Senate Bill No. 775

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was enacted to " 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)"

(*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) Senate Bill 1437 did this by amending section 188, which defines malice, and section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, §§ 2 & 3.) Amended section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Amended section 189 states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] [or] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Senate Bill 1437 also established resentencing relief for eligible defendants. (§ 1172.6, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 707-708.) Under section 1172.6, subdivision (a), "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition" with the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts "when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a

9

trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" under Senate Bill 1437. After receiving a petition containing the required information, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Strong*, at p. 708, citing § 1172.6, subd. (c).) If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c), (d)(3).)

Effective January 1, 2022, Senate Bill No. 775 (2020-2021 Reg. Sess.) (Senate Bill 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California law as amended by Senate Bill 1437 and (2) "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1, subd. (c).) Senate Bill 775 clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill 1437. (*People v. Clements* (2022) 75 Cal.App.5th 276, 294, 297 (*Clements*).)

2. Implied Malice Aiding and Abetting Murder

Although Senate Bill 1437 amended the felony murder rule to ensure that murder liability would be imposed only on perpetrators with malice aforethought, it did not change the definition of malice. (*People v. Gentile* (2020) 10 Cal.5th 830, 844.) Express malice exists "when there is a manifest

intent to kill." (*Ibid*., citing § 188, subds. (a)(1) and (2).) It is shown when the defendant either desires the victim's death or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Implied malice exists if "someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart.'" (*Gentile*, at p. 844, citing § 188, subd. (a)(2).) "'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)

Aider and abettor liability is "'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.'" (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*), quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) In other words, "'[a]n aider and abettor must do something *and* have a certain mental state.'" (*Powell*, at p. 712.) "For the direct aider and abettor, the [act] includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Id*. at p. 713.) Further, "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Id*. at p. 714.)

## B. *Discretion to Reduce a Murder Conviction*

We review the interpretation of a statute de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) We " ' " ' "begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' " (*Ibid.*) If the plain language is clear and unambiguous, we end our inquiry. (*People v. Johnson* (2002) 28 Cal.4th 240, 244.) If the statute's language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute governs. (*Ibid.*)

The prosecution meets its burden under section 1172.6 if it proves beyond a reasonable doubt that the defendant "is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) In that instance, the defendant is not entitled to relief, and the court denies the petition for resentencing. (*Ibid.*) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*) In that instance, the conviction "shall be redesignated as the target offense or underlying felony for resentencing purposes" if "murder or attempted murder was charged generically . . . ." (*Id.* at subd. (e).)

The statute does not detail eligible degrees of murder. For relief it simply requires the defendant to have been convicted of "murder, attempted murder, or manslaughter" in a situation in which the petitioner "could not presently be convicted of murder or attempted murder" because of changes to sections 188 or 189. (§ 1172.6, subd. (a)(2), (3).) Like our colleagues in *People v. Gonzalez* (2023) 87 Cal.App.5th 869, at page 881, we conclude this language is reasonably clear. It treats all murder as a single, generic crime

and requires resentencing when a defendant could not now be convicted of murder, generically.[4] The statute authorizes the court to take one of two actions: deny the petition for relief or grant the petition for relief. (*Gonzalez,* at p. 881.) In granting the petition, the court vacates the murder conviction and redesignates it as the target offense or the underlying felony. In directing the court to redesignate the murder conviction to the target offense or the underlying felony, the statute provides no mechanism for the court to *reduce* a first degree murder conviction to second degree.

It seems significant that if the defendant did not commit murder under the amended sections 188 or 189, section 1172.6 does not allow the People to retry the defendant on a lesser homicide offense even if the evidence would support it. Thus, the statute would appear to achieve rough justice rather than perfect justice under the revised law. But if the Legislature intended to ensure that no defendant remains convicted of a crime greater than what he or she would be guilty of under the revised statutes, it is free to amend section 1172.6 to say so.

Here, the defendant was charged generically with murder in count 1 and convicted of that crime. To deny the defendant relief, the statute required the prosecutor to prove beyond a reasonable doubt that the

---

[4] A "generic murder" is a murder charge that does not specify a degree. (*People v. Jones* (2014) 230 Cal.App.4th 373, 377.) A murder charged generically does not limit the prosecution to any particular theories of liability. (*People v. Flores* (2022) 76 Cal.App.5th 974, 987; *People v. Eynon* (2021) 68 Cal.App.5th 967, 977-978.)

defendant was still guilty of murder, and the prosecutor successfully did so. Thus, the defendant was not entitled to have his murder conviction vacated.[5]

### C. *Section 1172.6 Analysis*

We review the trial court's factfinding on the question of whether a defendant committed a murder under a still-valid theory for substantial evidence. (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, at p. 298.) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical

---

[5] We note that the court did not reach a conclusion regarding whether the prosecution proved Didyavong was guilty of first degree murder. It explained a finding of any degree of murder would be sufficient, and it discussed only its findings regarding second degree murder.

inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

At issue is whether Didyavong acted in a way that demonstrated an awareness that he was " 'engaging in conduct that endangers the life of another' " (*Cravens*, *supra*, 53 Cal.4th at p. 507), and whether he acted "with conscious disregard for human life" (*Powell*, *supra*, 63 Cal.App.5th at p. 714).

The People's gang expert testified that respect was important to the gang Didyavong associated with, and failure to respond to disrespectful conduct would have been a sign of weakness. Those who accompanied the gang member in an act of retaliation were expected to participate in the activity. Thus, Didyavong's presence at the scene suggests he was there to participate in David's beating. Although there was testimony that an attack resulting in death would be a "severe" response that "doesn't happen every day," there was also testimony that the firing of a gun and the use of other weapons in a beating would not be an unusual response from this gang because they are extremely violent and "go to win." As the court explained, based on the history of this gang and Didyavong's participation in the assault with a baseball bat, he would know weapons could be involved in a confrontation like this one.

Didyavong identifies Phanbandith's shooting David as the life-endangering act and emphasizes that he did not know a gun was present before the shots were fired and so could not have been aware of or shared Phanbandith's intent. Specifically, he argues there was no evidence that David suffered three shots "point blank," that anyone was positioned between Phanbandith and David immediately before or during the shooting, or that there was any time lag between the gun's appearance and the shooting.

However, there was evidence in the record to support such inferences. For example, Phomthavong testified that the shooter was "right on top of David," suggesting that the shots were fired "point blank." Moreover, David was lying on the ground when he was shot, and others, including Didyavong, were kicking and beating him. This indicates that there was some passage of time from when Phanbandith retrieved the weapon and the time he began shooting because the other attackers had to move out of the way to make space for Phanbandith to use the gun "right on top of David." Thus, even if he were not initially aware of Phanbandith's intent, he became aware of it.

Further, Didyavong's argument presumes a lack of knowledge that a gun could be used, a conclusion contradicted by the history and culture of this gang's retaliatory conduct according to Detective Gallivan. It also presumes that an attack could only be deadly with the use of a gun, which is simply false.

Insofar as Didyavong means to suggest that his conduct does not show he harbored the requisite intent because the life-endangering act was the shooting and not the physical damage imposed by his use of a bat, we disagree. Although the cause of death was gunshot wounds, Didyavong aided the commission of the life-endangering act of the violent, life-threatening retaliation. David was kicked, beaten with a bat and a lead pipe, and stabbed multiple times with a screwdriver. Didyavong actively participated by beating David with a bat while David was held down. Even if Didyavong did not plan for murder to occur, his participation in the violent attack and his use of a weapon to beat David demonstrates his participation in the commission of a crime for which the natural consequences are dangerous to human life. Moreover, Didyavong's use of a bat to smack David's skull after David had been shot, even as the other gang members ran back to their cars,

16

demonstrates an awareness that he was endangering David's life.  (See *Cravens*, *supra*, 53 Cal.4th at p. 507; see also *Powell*, *supra*, 63 Cal.App.5th at pp. 713.)  Thus, substantial evidence supports the superior court's conclusion that Didyavong's acts and mental state reflect that he was an aider and abettor whose conduct demonstrated an abandoned and malignant heart.

DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:


DATO, J.


DO, J.