Filed 1/17/25  P. v. Fuentes CA1/5
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN FUENTES,<br><br>    Defendant and Appellant. | A166990<br><br><br>(San Mateo County<br>Super. Ct. No. 17-SF-013004-A) |

A jury found Christian Fuentes guilty of first degree murder and true special circumstance of lying in wait.  Fuentes argues insufficient evidence supported one element of the lying-in-wait special circumstance—the requirement that there be a substantial period of watching and waiting for an opportune time to act.  We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    *The Shooting*

Around July 4, 2011, Fuentes's friend Jamie Cardenas told Fuentes that Jamal Thomas stole Cardenas's drugs, money and guns.  Cardenas confided to Fuentes that he planned to kill Thomas.

Fuentes did not know Thomas, but Cardenas pointed him out to Fuentes.  Fuentes approached Thomas under the guise of seeking to buy marijuana.  The two exchanged phone numbers so that they could arrange a deal later.

1

Fuentes and Thomas agreed to rendezvous the next morning, around 1:00 a.m. or 2:00 a.m.  Thomas was already at the meeting point on Annapolis Street in East Palo Alto when Fuentes and Cardenas arrived. Cardenas got out of their car and said to Fuentes, " 'I'm gonna go kill this fool.' "  But Fuentes talked him out of it because he saw " 'a girl in the passenger seat' " as well as " 'a kid in the backseat [*sic*].' "  After they completed the drug transaction, Fuentes chastised Cardenas for not paying sufficient attention to his surroundings before attempting to commit murder.

Fuentes and Cardenas tried to meet Thomas another time, again under the pretense of buying marijuana, but Thomas never arrived.

About a week after the first encounter, Fuentes and Cardenas saw Thomas walking around.  Cardenas believed that Thomas lived on Annapolis Street and said to Fuentes, " 'We're gonna get him tonight.' "  Cardenas bought a handgun and ammunition that night.  Because Cardenas did not want to use his own car in the commission of the murder, Fuentes stole a car.

Fuentes and Cardenas then met up with their friend Fidel Silva and told him their plan to murder Thomas.  Silva provided them with gloves as well as wipes to clean their ammunition.  Silva also agreed to drive them, and he gave Fuentes a handgun.  But Silva did not " 'believe in drive-by shootings,' " so he directed Fuentes and Cardenas " 'to go buy the weed, act like you guys looking for the money, take the gun out and kill him.' "  They agreed.

It is unclear who, or when that person, set up the next meeting with Thomas.  However, the group spoke on the phone with Thomas multiple times that night.  On one call, the group "lied" to Thomas, saying they were at a convenience store and asking if he wanted anything to drink.  Also,

either Fuentes or Silva asked Thomas if he was alone, which Thomas answered affirmatively.

Thomas, however, lied too; he was not alone. Thomas met up with Catherine Hildalgo and Catherine Fisher, and the three drove to Annapolis Street in Hidalgo's white SUV. Hidalgo drove, Fisher sat in the front passenger seat, and Thomas was in the rear passenger seat directly behind Fisher.

Fuentes called Thomas when he began driving over to the meeting spot. Thomas told Fuentes he would be in a " 'white SUV.' " Upon arriving, however, the group (Fuentes, Cardenas and Silva) saw two similar white vehicles parked near each other. Silva ended up driving past Hildago's SUV and parked behind a hedge that blocked the line of sight to the SUV.

Thomas asked Fuentes over the phone, " 'Was that you guys that just pulled up?' "[1] Fuentes affirmed it was and asked, " 'Where you at?' " Thomas replied, " 'I'm in the white SUV,' " and clarified he meant the white SUV " 'backed up in the driveway.' "

"[T]he whole time," Fuentes, Cardenas, and Silva were "talking about what [they] were gonna do." Fuentes and Cardenas "were supposed to go and talk to [Thomas], act like we're buyin' the weed, get the weed from him, act like we're lookin' for the money, pull the gun and kill him." Indeed, before Fuentes and Cardenas got out of the car, Silva reminded them, " 'Look, this is how y'all gonna do,' " to which they responded, " 'We already know. We—we already talked about it.' "

"[A]t least 30 seconds" passed between the time when Silva drove past the SUV and when Hildago heard car doors closing. About five to ten seconds

---

[1] It is unclear whether Thomas called Fuentes or if they were already speaking on the phone.

later, Fuentes and Cardenas rounded the hedge and came into view of the SUV. Rather than stick to the plan, Cardenas pulled out his handgun and started "unloadin' the clip" on the passenger seat. Fuentes then joined in, shooting "the other side."

Fisher was fatally wounded. Fuentes, Cardenas, and Silva fled the scene.

## II. *Procedural History.*

In October of 2019, the San Mateo County District Attorney filed an information charging Fuentes with murder (Pen. Code, § 187, subd. (a))[2] and attempted murder (§§ 187, subd. (a), 664). The district attorney alleged that Fuentes committed the murder by lying in wait (§ 190.2, subd. (a)(15)) and that the attempted murder was willful, deliberate, and premeditated (§ 189). The district attorney filed further allegations and sentencing enhancements not pertinent here.

The first trial resulted in a mistrial. At a second trial, the jury found Fuentes guilty on both counts. Moreover, the jury found true that Fuentes committed the murder by lying in wait.

The trial court sentenced Fuentes, on the murder count, to life in prison without the possibility of parole. Fuentes appealed.

## DISCUSSION

Fuentes contends insufficient evidence supported the jury's finding that he committed murder by lying in wait. We disagree.

In reviewing sufficiency of the evidence, "we must review ' "the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a

---

[2] All statutory references are to the Penal Code unless otherwise stated.

4

reasonable jury could find" ' the special circumstance allegation true ' "beyond a reasonable doubt." ' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.)  In making that determination, "we presume in support of the judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550 (*Nelson*).)

"The ' "lying-in-wait special circumstance requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . .' " ' " [Citation.]' " (*People v. Parker* (2022) 13 Cal.5th 1, 58.)

Fuentes only challenges the sufficiency of the evidence supporting the second element, "watchful waiting."  He emphasizes the undisputed evidence establishes that he arrived at Annapolis Street *after* Thomas, Hildago, and Fisher.  He therefore contends he did not engage in watchful waiting because it was his victims who "got there first and waited about 30 minutes for [Fuentes] and his cohorts to arrive."  Fuentes further asserts that because Cardenas began shooting shortly after exiting the car, any period of watchful waiting was not long enough to be "substantial."  We are unpersuaded that a necessary condition of watchful waiting is the perpetrator's arriving before his target, and we do not agree that the period of watchful waiting was too short.

Our high court has explained the period of watchful waiting must be "substantial," yet " ' "[t]he precise period of time is also not critical." ' " (*People v. Cage* (2015) 62 Cal.4th 256, 279 (*Cage*).)  Instead, the " 'purpose' " of the watching and waiting element " ' "is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.

5

[Citation.] This period need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' " ' " (*Ibid.*; see *People v. Russell* (2010) 50 Cal.4th 1228, 1245 ["Even a short period of time is sufficient to overcome an inference that a defendant acted rashly"].) Thus, because its purpose is to evidence the requisite state of mind, the watchful waiting element requires that the defendant wait "for an opportune time to act"; it does not require the perpetrator to wait on his victim at the scene of the planned assault and need only be long enough for the defendant to reflect on his intentions. (*Cage*, at p. 279.)

*Cage* is instructive. There, the defendant hid a gun in a laundry basket of clothes; when his victim opened the door, the defendant fatally shot her before proceeding upstairs and murdering a second victim. (*Cage, supra*, 62 Cal.4th at pp. 263, 279.) The defendant, in *Cage*, argued that "even if his use of the laundry basket could be considered a planned concealment, there [was] insufficient evidence of the second requirement—a substantial period of watching and waiting for an opportune time to act." (*Id.* at p. 279.) Our Supreme Court disagreed. It cited witness testimony that the victims' dog "barked briefly around 10:30 or 10:45 p.m. and that shots were fired several minutes later," concluding "[s]uch testimony could support an inference that defendant conversed with [the first victim] for a few minutes before removing the gun from the basket and shooting her. During such time defendant could have reflected on his intentions, such that his subsequent actions in taking the shotgun out of its hiding place and shooting [the first victim] and then proceeding upstairs to [the second victim's] room were not the product of a rash impulse." (*Ibid.*)

Setting aside Fuentes's watchful surveillance in earlier attempts on Thomas's life and his previous admonishment to Cardenas that they wait to target Thomas when there would be less risk of collateral damage, the record amply supports an inference that Fuentes watched and waited for an opportune time to attack in the moments before the fatal shooting of Fisher. At trial, Hildago testified that "at least 30 seconds" passed between when she lost sight of the vehicle Fuentes arrived in and when she heard car doors closing. Fuentes described that "before [he and Cardenas] even jumped out the car" they "were tryin' to debate" which white vehicle Thomas was in, but "the whole time [they were] talking about what [they] were gonna do." Meanwhile, Fuentes spoke to Thomas to identify which vehicle he was in before he got out of the car. In sum, they watched and waited to discern whether and where to attack.

Hildago further testified that she first saw the attackers "about five to ten seconds after [she] heard the last car door close . . . ." Given the time it took for Fuentes to identify the SUV and then to round the hedge, a rational juror could infer there was a period of watching and waiting "substantial in the sense that it shows a state of mind equivalent to premeditation or deliberation." (*Cage, supra*, 62 Cal.4th at p. 279; see *People v. Nieves* (2021) 11 Cal.5th 404, 465–466 ["From this evidence the jury could reasonably find a 'continuous flow' of lethal events in which defendant concealed her purpose and waited until her children fell asleep so that she could set a fire to kill them and herself"].)

Moreover, that same evidence permits a rational juror to infer that, after identifying the correct vehicle to ambush, Fuentes and Cardenas decided that moment was opportune because a hedge obscured their approach.

Fuentes's reliance on *Nelson* is misplaced. There, the defendant went to where he expected the victims to be, concealed his bicycle, snuck up behind them, and shot them in quick succession. (*Nelson, supra*, 1 Cal.5th at p. 551.) While the defendant concealed himself and surprised his victims, a majority of our Supreme Court explained, "There [was] no evidence, however, that Nelson arrived before the victims or waited in ambush for their arrival. In the absence of such evidence, there is no factual basis for an inference that before approaching the victims, he had concealed his bicycle and waited for a time when they would be vulnerable to surprise attack." (*Ibid.*)

*Nelson* did not hold the defendant *must* wait for the victim to arrive at the scene of the ambush to prove the lying-in-wait special circumstance. Rather, the majority refused to surmise that the defendant waited for an opportune time to attack, as opposed to impulsively attacking as soon as he arrived. (*Nelson*, *supra*, 1 Cal.5th at p. 552 ["Contrary to the concurring and dissenting opinion, the fact that there was substantial evidence of premeditation and deliberation does not necessarily mean there was substantial evidence of watching and waiting for an opportune time to act"]; cf. *id.* at p. 575 (conc. & dis. opn. of Corrigan, J.) ["Whether he arrived at the scene first or his victims did, it is inferable that as he approached the car from behind, he was watching the victims for any sign they might discover his presence, and waiting until he was in position to shoot them before they did"].) As the majority explained, "[t]he jury was presented with no evidence from which it could have chosen, beyond a reasonable doubt, that scenario over one in which defendant arrived after the victims, dismounted from his bicycle, and attacked them from behind without any distinct period of watchful waiting." (*Nelson*, at p. 551.)

For the reasons discussed *ante*, that is not the case here.  Again, there was a distinct period of "at least 30 seconds" in which Fuentes looked for Thomas and "debate[d]" which vehicle to attack, and then there were another "five to ten seconds" during which Fuentes snuck around the hedge and joined in Cardenas's assault.  Accordingly, the record sufficiently supported the jury's finding that Fuentes committed murder by lying in wait.

## DISPOSITION

The judgment is affirmed.


                                                   Jackson, P. J.


WE CONCUR:

Simons, J.
Chou, J.


A166990/*People v. Christian Fuentes*